**UNITED STATES of America, Plaintiff,**

v.

**The RAINBOW FAMILY, also known as the Rainbow Nation, et al., Defendants.**

**Civ. A. No. L–88–68–CA.**

United States District Court, E.D. Texas, Tyler Division.

June 1, 1988.

Bob Wortham, Steven Mason, Asst. U.S. Atty., Tyler, Tex., O. Kenneth Dodd, U.S. Atty., Beaumont, Tex., for U.S.

Larry R. Daves, Daves, Hahn & Levy, Tyler, Tex., for Principle, "Electric Ed" and Holley Lynn, Barry Adams, Michael John, Water Singing On The Rocks, Diane Temperance, & Little White Owl & Spring Council.

Barry Adams, Missoula, Mont., pro se.

### ORDER

JUSTICE, Chief Judge.

The United States of America seeks a preliminary injunction against the defendant Rainbow Family and its members, which would prohibit the defendants in any way from preparing for, or attending, or participating in any Spring Council, Summer Gathering or other meeting of twenty-five or more persons in any National Forest in the State of Texas, unless they have applied for and obtained a "special use" permit from the U.S. Forest Service.

A temporary restraining order was entered on May 12, 1988, and extended on May 19, 1988, which temporarily restrained and enjoined the defendants from holding any Spring Council or other meeting of twenty-five persons and more in any National Forest in the State of Texas, or from organizing or preparing for any such meeting, unless a special use permit was obtained from the U.S. Forest Service. The temporary restraining order will expire on June 2, 1988.

Pursuant to 28 U.S.C. § 636(b)(1)(B), the Honorable J. Michael Bradford, United States Magistrate, was designated to conduct an evidentiary hearing and to submit proposed findings of fact and recommendations for the disposition of the motion for preliminary injunction. Hearings on the motion were conducted on May 13 and May 19, 1988, in Lufkin, Texas. The magistrate's report and recommendations were submitted on May 27, 1988 and objections thereto by the parties were received on May 31, 1988. The report has been considered by the court and a *de novo* review of the objections of the parties has been conducted. For the reasons below, the recommendations of the magistrate shall be adopted in part, and rejected in part, and the motion for preliminary injunction shall be denied.

### I.

To obtain a preliminary injunction, a plaintiff must show "(1) a substantial likelihood [of prevailing] on the merits, (2) a substantial threat that irreparable injury will result if the injunction is not granted, (3) that the threatened injury outweighs the threatened harm to defendant, and (4) that granting the preliminary injunction will not disserve the public interest." *Canal Authority of State of Florida v. Call-*

*away,* 489 F.2d 567, 572 (5th Cir.1974), *quoted in Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 621 (5th Cir.1985). "[T]his four step analysis is actually a tool to assist the court in answering the essential question determining the propriety of a preliminary injunction, *i.e.,* whether the injunction is necessary to render a meaningful decision on the merits." *Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel,* 640 F.2d 560, 568 (5th Cir. 1981). A preliminary injunction is "an extraordinary and drastic remedy which should not be granted unless the movant has clearly carried the burden of persuasion concerning the existence and application of ... the four prerequisites to such relief." *State of Texas v. Seatrain International,* 518 F.2d 175, 179 (5th Cir.1975).

The motion for preliminary injunction, like the government's application for a temporary restraining order, seeks solely one form of relief—that the defendants be enjoined from gathering, or from preparing for any gathering, in the National Forests, unless and until they have applied for and received a special use permit. The defendants have raised a number of objections to the requested relief, arguing, *inter alia,* that they are not subject to suit or to the jurisdiction of this court, that the permit regulations have not been lawfully adopted, and that the regulations are unconstitutional. They further contend that the government has failed to demonstrate the likelihood of irreparable harm if the injunction does not issue, or a likelihood that it will suceed on the merits.

Plainly, if the special use permit regulations are unlawful or unconstitutional, the government's basis for the preliminary injunction evaporates and the injunction must be denied. At the hearing on the motion for temporary restraining order, it was determined that the government had sufficiently shown a likelihood of threat to public safety, health, and to Forest Service property, such that, if not temporarily restrained and enjoined, irreparable harm could result from the defendants' failure or refusal to secure a special use permit in advance of any gathering on Forest Service land. *See* Temporary Restraining Order, entered May 12, 1988, at 3. In regards to the preliminary injunction, therefore, the magistrate was instructed that he should take evidence and argument on the various objections raised by the defendants, including whether the court could properly exercise jurisdiction, whether the special use permit regulations would in fact apply to any anticipated Rainbow Family Spring Council or Summer Gathering on Forest Service lands, and whether the special use permit regulations have been lawfully adopted or impermissibly burden the defendants' constitutional rights. *Id.,* at 3–4.

In these respects, the magistrate proposes the following findings and recommendations: 1) That the special use permit regulations would apply to any anticipated Rainbow Family council, meeting or gathering of twenty-five or more persons on National Forest lands; 2) that the regulations governing special use permits have been lawfully adopted; and 3) that the regulations do not violate the defendants' constitutional rights under the First Amendment. Report, at 3–19. The defendants have objected to these proposed findings, and the court has reviewed *de novo* the relevant evidence in the record and the case authorities presented by the parties and the magistrate. As the discussion below explains, while the defendants may be subject to the court's jurisdiction and the special use permit regulations would certainly apply to any anticipated Rainbow Family gathering or meeting in the National Forests, it appears that certain portions of those regulations have not been validly promulgated and hence are ineffective. Moreover, insofar as the regulatory scheme regarding special use permits distinguishes between expressive conduct, protected by the First Amendment, and other forms of conduct, and to the extent that the regulations do not contain clear and narrowly drawn standards for issuance or denial of permits affecting such expressive conduct, the regulations transgress the First Amendment and cannot be enforced by this court.

## II.

The first question for consideration is whether the defendant Rainbow Family,

also known as the Rainbow Nation, the Rainbow Family of Living Light, and the Gathering of the Tribes, is an entity subject to suit and against which an injunction might be entered. The defendants have consistently denied that they can be sued as an entity, contending that there is no organization, structure, or hierarchy to the Rainbow Family, but that it merely connotes a gathering of persons sharing a similar outlook or philosophy. Beyond their contention that the Rainbow Family is not a organization, unincorporated or otherwise, the defendants also object that service of process upon the Rainbow Family cannot be effected by service upon one or more individuals who, at most, merely associate with the Rainbow Family on a voluntary basis. The government, on the other hand, contends that the Rainbow Family acts as an unincorporated organization, that it may be sued as such under the provisions of Federal Rule of Civil Procedure 17(b), and that service of process upon the organization may be effected by service upon one or more of its members.

As found by the magistrate, the evidence adduced at the hearing before him "is substantial that the Rainbow Family is a combination of persons with common interests, goals, objectives and purposes." Report and Recommendation of United States Magistrate, May 27, 1988 (hereafter "Report"), at 23. The magistrate, therefore, found that the Rainbow Family may be sued as an unincorporated association under Rule 17(b), and, further, that service of process upon that defendant has properly been accomplished by service upon several individuals who act as agents or representatives of the Rainbow Family. Report, at 24–25, *citing Kay v. Bruno,* 605 F.Supp. 767, 771 (D.N.Hamp.1985); *Eastern States Petroleum v. Texas & N.O.R. Co.,* 114 S.W. 2d 408 (Tex.Civ.App.1938).

Upon review of the testimony and other evidence submitted at the hearings, it is found that the conclusions and recommendations of the magistrate are correct, and the objections of the defendants are without merit. The evidence reveals that the Rainbow Family, although informal and loosely-knit, nonetheless operates as an organization, with decision-making "councils," individuals who acts as agents, representatives, or leaders on a voluntary basis, and which has an informational network. Meetings or gatherings are held in many parts of the country throughout the year, and an annual "Summer Gathering" has taken place for the last seventeen years, drawing participants from around the nation and around the world. Participants in such gatherings share many common interests and political values or ideals, and express those shared ideas and interests through Rainbow Family activities. Although decisions are made collectively, on such matters as the time and location of future gatherings, nevertheless, a recognized decision-making structure exists, as well as methods of disseminating decisions and other information.

■ Moreover, service of process upon such an organization, where there are no established leaders or agents, may be effectuated by service upon its individual members, particularly where, as here, the individuals so served act in a leadership or representative capacity, by negotiating on behalf of the Rainbow Family or "scouting" for sites for a gathering. To hold otherwise would permit organizations to maintain a fiction that they have no leaders or agents and hence evade legal process altogether, which the law will not allow.

Accordingly, the magistrate's findings and recommendation that the Rainbow Family may be subject to suit as an unincorporated association under Federal Rule of Civil Procedure 17(b), and that service of process has been properly effected upon such unincorporated association by service upon several of its individual members, are, hereby, adopted by the court.

### III.

■ The magistrate was additionally instructed to take evidence and to prepare proposed findings of fact and recommendations to the court with respect to the allegations contained in the plaintiff's amended complaint for injunction, that the defendants may be sued as a defendant class

under the provisions of Federal Rule of Civil Procedure 23. In particular, the magistrate was requested to consider, as to the prerequisites for a class action under Rule 23(a), whether 1) a proposed class of defendants, their affiliates, and other persons planning on attending the 1988 Rainbow Family Summer Gathering are so numerous that joinder of all such members and persons is impracticable; 2) whether there are questions of law and fact common to the proposed class; 3) whether the claims or defenses of the named individual defendants, upon whom summons has been served, are typical of the claims or defenses of the proposed class; and 4) whether any one or more of the named individual defendants, upon whom a summons has been served, will, as representative parties, fairly and adequately protect the interests of the class.

The magistrate concluded that all four prerequisites to the certification of a defendant class, under Rule 23, are present. The defendants object most strongly to the magistrate's finding regarding the fourth factor, regarding whether the individual named defendants would fairly and adequately protect the interests of the class if they were designated as class representatives. In particular, the defendants contend that no individual or individuals can speak for, or represent, the group of Rainbow Family members and others who might attend the 1988 Rainbow Family Summer Gathering, because the group is comprised of numerous and otherwise unrelated individuals, and because it is a "consensus democracy," without hierarchical structure. Moreover, many of the individual defendants have asserted Fifth Amendment immunities from testifying in any way in this case, which they argue will inhibit their respective abilities fairly and adequately to represent the class.

After thorough review of the evidence and the arguments of the parties, it is concluded that the magistrate's findings and recommendations on the four factors identified above, relating to the maintenance of a defendant class in this action, are correct. As to the ability of the individual defendants to fairly and adequately represent the interests of the class, the testimony in the record shows that tasks necessary to carry out Rainbow Family functions, such as councils or gatherings, are undertaken by individual volunteers, *pro re nata*, depending on their particular abilities and desires. The individually named and served defendants were identified by the government because of their willingness to take an active role in the Rainbow Family gatherings, including the Summer 1988 Gathering. They should, therefore, be at least as competent to represent a defendant class as any other member. If any other member objects to how class-wide issues are being handled, of course, he or she can always come forward to challenge the class representative.

Therefore, the magistrate's findings and recommendations as to the prerequisites of maintaining this action as a defendant class action, under Fed.R.Civ.P. 23(a), shall be, and they are hereby, adopted as the findings and conclusions of this court.

### IV.

The remaining issues for consideration go to the substance of the plaintiff's motion for preliminary injunction, namely: whether the government can validly require the defendants to obtain a special use permit before holding any gathering or meeting of twenty-five persons or more in any National Forest in the State of Texas; whether the government has made the necessary showing to obtain injunctive relief; and whether a preliminary injunction is the only appropriate and available remedy to the government to enforce the special use permit regulations in this instance.

The defendants have argued througout these proceedings that they are not subject to the Forest Service's permit requirements, and that the regulations governing special use permits for the National Forest System are unlawful, unconstitutional, and without binding effect upon them. They also contest that the Forest Service or the government will suffer irreparable harm if an injunction does not issue, although the magistrate reports that they have failed to

present evidence in this regard. *See* Report, at 25–26.[1] The defendants have not raised in any detail the argument that the government has an adequate remedy at law for any alleged violation of the special use permit regulations; nor was the magistrate directed to take evidence on, or otherwise to address, this issue. Nevertheless, as is appropriate in determining a request for preliminary or other injunctive relief, the court will also consider this factor. *See Northern California Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 105 S.Ct. 459, 83 L.Ed.2d 388 (1984) (Rehnquist, then-Justice, sitting as Circuit Justice).

A. *The Special Use Permit Regulations*

The regulations at issue here, concerning "special uses" of the National Forest System lands and the instances in which permits for such uses are required, are found at 36 C.F.R. Part 251, Subpart B. They were promulgated by the Secretary of Agriculture, pursuant to his statutory authority to prescribe rules and regulations concerning uses and preservation of the lands under the National Forest System. *See* 16 U.S.C. § 472; 16 U.S.C. § 551; 43 U.S.C. § 1740.

The regulations in Part 251 which define "special uses," and establish the types of uses for which a special use permit is required, were originally published on June 6, 1980, and amended on June 21, 1984. In addition, a second revision of the regulations, in the form of an interim rule to take immediate effect, was published by the Secretary of Agriculture in the Federal Register on May 10, 1988, the day on which the government filed its complaint and application for a temporary restraining order. *See* 53 Fed.Reg. 16548 (May 10, 1988), *amending* 36 C.F.R. § 251.50 *et seq.* (1987). It is this second revision of the regulations that defendants contend has not been valid-

ly adopted. Because the May 10, 1988, interim rule alters the previously existing regulations in several respects central to the issues presented here, a detailed description of the regulations as they appeared before and after the May 10, 1988 revisions is required.

Under the regulations prior to May 10, 1988, *"All uses* of National Forest System land, improvements, and resources ... are designated *'special uses'* and must be approved by an authorized officer," with exceptions regarding disposal of timber and minerals and grazing of livestock, which are governed by separate regulations. 36 C.F.R. § 251.50(a) (June 6, 1980, as amended June 21, 1984) (emphasis added). The regulations provide, however, that a "special use authorization is *not* required for the noncommercial use or occupancy of National Forest System lands or facilities for camping, picnicking, hiking, fishing, hunting, horse riding, boating, or similar recreational activity," *unless* the activity is one defined as a "recreation event" or as a "special event." 36 C.F.R. § 251.50(c) (emphasis added).

A "recreation event," for which a special use permit must be obtained under the regulations, is defined as "a planned, organized, or publicized recreational activity engaged in by a total of ten (10) or more participants and/or spectators, that involves competition, entertainment, or training such as, but not limited to, animal or vehicle races or rallies, dog trials, fishing contests, rodeos, fairs, regattas, and games." 36 C.F.R. § 251.50(i). A "special event," for which a special use permit is also required, is defined as "a meeting, assembly, demonstration, parade, or other activity, engaged in by ten (10) or more participants and/or spectators, for the purpose of expression or exchange of views or judgments." 36 C.F.R. § 251.50(1).

---

1. Exhibits were introduced by defendants in opposition to the government's assertion that irreparable harm to public health and safety, and to Forest Service lands, would result from a Rainbow Family Summer Gathering for which no permit has been obtained. *E.g.,* Defendants' Exhibits 2 & 3 (Forest Service reports on the

1978 and 1979 Rainbow Family Summer Gatherings). In view of the holding herein, however, it is unnecessary to address such contentions at this time. Both parties may, however, present further evidence on this question at the hearing on the final injunction.

The regulations, then, define *all* uses of the National Forest lands (with the exceptions relating to timber, minerals, and grazing) as "special uses," but exempt "noncommercial use or occupancy"—such as camping, hiking, or picknicking—from the special use permit requirement. All other uses, including "recreation events" (ten or more persons involved in a competitive or entertainment activity), "special events" (ten or more persons engaged in expressive activity), or commercial uses of the forests, must obtain the special use permits.

Based upon this definitional distinction between "recreation events" and "special events," the regulations prior to May 10, 1988, also established separate standards for the denial or issuance of a special use permit. A special use permit for any use *other than* a "special event" (*i.e.*, for recreation events or for commercial uses of National Forest lands), may be denied if 1) the proposed use "would be inconsistent or incompatible with the purpose(s) for which the lands are managed, or with other uses;" 2) the proposed use "would not be in the public interest;" 3) the "applicant is not qualified;" 4) the use would "otherwise be inconsistent" with federal or state law; or 5) the "applicant does not or cannot demonstrate technical or financial capacity." 36 C.F.R. § 251.54(h).

As to "special events" themselves, different criteria for the denial or issuance of a special use permit are set forth in the regulations than for other uses. The regulations provide that a permit application is to be granted *unless* the reviewing officer determines that:

(1) The special event would conflict with another use which has been previously approved by special use authorization, contract, or approved operating plan ...; or

(2) The special event would present a clear and present danger to the public health or safety; or

(3) the special event would be of such nature or duration that it could not reasonably be accomodated in the particular place and time applied for; or

(4) The application proposes activities that are contrary to the provisions of Part 261 of this chapter [concerning prohibited uses of National Forest lands and property] or the provisions of any other Federal or State criminal law.

36 C.F.R. § 251.54(i).

Thus, on their face, the regulations distinguish between expressive and other forms of conduct, and provide different grounds for the approval or denial of a special use permit based upon that distinction. Because of this facial differentiation between expressive activity and other forms of group activity in the National Forests, the permit regulations were held invalid under the First Amendment, two years ago, by the United States District Court for the District of Arizona. *United States v. Israel*, No. CR–86–027–TUC–RMB (May 10, 1986).

The *Israel* ruling prompted the Forest Service to revise the regulations, in the form of the interim rule published May 10, 1988. The interim rule does not alter the general special use permit scheme outlined above; rather, it amends the existing regulations in several respects. Most notably, the interim rule eliminates the previous distinction between "special event" and "recreation event," and creates instead a single category of "group event" for which a special use permit is required. 53 Fed. Reg. at 16548–50. A "group event" requiring a special use permit is defined under the interim rule as "an organized or publicized activity involving, or expected to attract, twenty-five or more persons and the use of National Forest System lands, resources, or facilities." 53 Fed.Reg. at 16550 (amending 36 C.F.R. § 251.50). The interim rule also adds new provisions concerning "noncommercial printed material," and slightly amends the previous standards contained in § 251.54, regarding approval or denial of special use permits. *Id.*

The preamble to the interim rule explains that such revisions are intended "to clarify that special use authorization for ... First Amendment activity will be granted unless certain conditions," specified in the regulations, "are not met." 53 Fed.Reg. at

16548. The interim rule, however, still makes a fundamental distinction between events involving expressive activity and other forms of "group events," by distinguishing between "group events for the public expression of views" and all other "group events." For example, the revisions to § 251.54 in the interim rule provide as follows:

(h) *Response to applications for the distribution of noncommercial printed material or for a group event for the public expression of views.* An authorized officer shall grant an application for authorization of distribution of noncommercial printed material or for a group event for the purposes of public expression of views, unless the officer determines that:

(1) The planned event or use would conflict with another use which has been previously approved . . .; or

(2) The planned event or use would present a clear and present danger to public health or safety; or

(3) The planned event or use would be of such a nature and duration that it could not reasonably be accommodated in the particular place and time applied for . . .; or

(4) The application proposes activities that are prohibited . . .; or

(5) There is no person or entity authorized to sign a special use authorization on behalf of the group applying for an authorization and/or there is not [sic] person or entity willing to accept responsibility for the group's adherence to the terms and conditions of the permit.

*Id.* (amending 36 C.F.R. § 251.54(i)). Separate criteria for "responses to applications for all other uses" are established, essentially adopting those previously contained at § 251.54(h). *Id.* That is to say, the regulations—even after the May 10, 1988, revisions—still make a fundamental distinction between expressive and other activities for purposes of approving or denying a permit application.

B. *Applicability of the Regulations*

As noted above, the defendants contend that the permit regulations are not applicable to them. If the permit regulations do not apply in this instance, obviously, the court need not consider further the motion for preliminary injunction, since the sole relief sought is to require that the defendants obtain a permit in advance of any gathering or meeting in the National Forests of twenty-five or more persons; nor would the court need to construe the defendants' further objections as to the validity and constitutionality of the regulations.

After taking evidence and argument on this issue, the magistrate concluded that the permit requirements would apply to any anticipated Rainbow Family meeting or gathering in the National Forests. Report, at 7. Indeed, there does not appear to be any question that, if valid, the regulations would apply to the Rainbow Family Summer Gathering, or other such meetings, because they involve organized or planned activities expected to attract twenty-five or more persons. Evidence of such organization and planning was offered by the government, including circulars promoting the up-coming Summer Gathering and other publications associated with the Rainbow Family, and the testimony of individual defendants about how decisions are reached on the location and timing of gatherings and councils. Thus, as the magistrate's recommendation in this regard appears to be correct, it will be, and it is hereby, adopted as the finding of this court.

C. *Validity of the Interim Rule Adoption*

■ The defendants further object that the present regulations have not been validly adopted, since the interim rule was published on May 10, 1988, to take effect that date, without opportunity for prior notice and comment. The magistrate was directed to take evidence and argument on this objection. He concluded and found that the interim rule was lawfully adopted. *See* Report, at 7–13. However, as explained below, this conclusion and finding

appears to be contrary to the law regarding agency rule making under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* Therefore, the magistrate's recommendation in this respect shall be, and it is hereby, rejected.

The APA, which governs agency rule making (including the interim rule in question here), establishes two requirements, relevant here, before an agency may adopt a rule or regulation pursuant to statutory authority. First, the APA requires that "[g]eneral notice of the proposed rule making shall be published in the Federal Register," and interested persons are to be given an opportunity to participate in the rule making through "submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(b) & (c). Second, after the proposed rule or regulation has received public comment or participation, the final rule is to be published "not less than 30 days before its effective date...." 5 U.S.C. § 553(d).

The interim rule was published on May 10, 1988, and states that it is to take effect upon publication. Moreover, no opportunity was provided for public comment or participation in advance of the publication; rather, the interim rule provides for opportunity to comment from the date of publication until July 11, 1988. 53 Fed.Reg. at 16548. Thus, it is incontestable that the interim rule was adopted without adhering to the requirements either for prior notice and comment, or for publication thirty days in advance of the date the rule is to take effect, as specified in 5 U.S.C. § 553(b), (c), and (d).

The APA, however, does provide several exceptions to these comment and publication requirements. Under § 553(b), for example, notice of the proposed rule making and an opportunity for comment or participation need not be provided, if the rule is "interpretive" of a legislative act, if it is a general statement of policy, or if it solely relates to agency organization or procedure. Similarly, notice and comment may be waived "when the agency for good cause finds (and incorporates the finding and brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(A) & (B).

The exceptions to the thirty-day waiting period after publication of a rule, before it takes effect, are analogous. The waiting period may be omitted where an exemption to a substantive rule is granted; where the rule is "interpretive" or is a statement of policy or agency procedure; or "as otherwise provided by the agency for good cause found and published with the rule." 5 U.S.C. § 553(d)(1)–(3).

The regulations at 36 C.F.R. Part 251 are patently substantive rules, not interpretive rules or related solely to agency procedures. Thus, the only possibly relevant exceptions here to the notice and comment and waiting period requirements are the "good cause" provisions quoted above. Unless the agency has specifically—and supportably—found that public notice and comment was "impracticable, unnecessary, or contrary to the public interest," under § 553(b)(B), *and* that "good cause" existed for the rule to take effect upon publication, under § 553(d)(3), it would appear that the interim rule was not validly adopted or effective on May 10, 1988. *See Levesque v. Block,* 723 F.2d 175, 187 (1st Cir.1983); *U.S. Steel Corporation v. U.S. EPA,* 595 F.2d 207, 214–15 (5th Cir.1979), *clarified* 598 F.2d 915 (1979).

In this respect, the preamble to the interim rule states that

> [I]t has been found and determined that advance notice and request for comments would be impracticable and contrary to the public interest. Because of the decision in *United States v. Israel,* the current rule pertaining to special use authorizations for large group gatherings on the National Forest System is unenforceable. The summer field season is close at hand and large groups will soon be gathering on the National Forests. It is, therefore, imperative that an enforceable rule be in place so that forest officers have a mechanism, where necessary, to control the impacts of these groups and

prevent unnecessary damage or risk to National Forest resources and facilities, and public health and safety.

53 Fed.Reg. at 16549. There is no explicit "good cause" finding with respect to the thirty-day waiting period requirement under § 553(d), although it may be inferred that the same reasons were found by the agency to justify waiver of this requirement. *See Wells v. Schweiker,* 536 F.Supp. 1314, 1323 (E.D.La.1982).

An agency's proffered rationale of "good cause," for failing to observe the notice and comment period required by 5 U.S.C. § 553(b), should be "closely examine[d]" by a reviewing court. *Mobil Oil Corp. v. Department of Energy,* 728 F.2d 1477, 1490 (Temp.Em.App.1983), *reh. en banc denied, cert. denied* 467 U.S. 1255, 104 S.Ct. 3545, 82 L.Ed.2d 849 (1984). *See also U.S. Steel, supra,* 595 F.2d 207; *City of Waco v. EPA,* 620 F.2d 84 (5th Cir.1980); *Wells, supra,* 536 F.Supp. at 1324. Moreover, the APA's statutory exceptions from notice and comment procedures must be "narrowly construed and reluctantly countenanced." *Mid-Tex Electric Cooperative v. FERC,* 822 F.2d 1123, 1132 (D.C.Cir.1987) (quoting *American Federation of Government Employees v. Block,* 655 F.2d 1153, 1156 (D.C.Cir.1981)); *U.S. Steel,* 595 F.2d at 214; *Baylor University Medical Center v. Heckler,* 758 F.2d 1052, 1058 (5th Cir.1985); K. Davis, *Administrative Law Treatise,* § 6.29 at 124 (1984). "As the legislative history clearly indicates, Congress was emphatic in its view that the exception for 'good cause' provided by § 553 is to be read stringently:

> The exemption of situations of emergency or necessity is not an 'escape clause' in the sense that any agency has discretion to disregard its terms or the facts. A true and supported or supportable finding of necessity or emergency must be made and published.

S.Doc. No. 248, 79th Cong., 2d Sess. at 200 (1946)." *State of South Carolina Ex Rel. Patrick v. Block,* 558 F.Supp. 1004, 1016 (D.S.Car.1983).

The Forest Service appears to place the entire weight of its finding that public notice and comment was not practicable, before the interim rule was promulgated, on the bases that the "summer field season is close at hand, and large groups will soon be gathering on the National Forests," and that the decision in *United States v. Israel* left the special use regulations "unenforceable." Notably lacking from the agency's finding, however, is any discussion of why it has taken the Forest Service exactly *two years* to finally promulgate revisions to the special use regulations, after the *Israel* decision. Two entire summer seasons have taken place in the intervening period, and the interim rule relates no adverse effects from the absence of any amendments to or revision of the regulations in that period. Certainly, there is no showing in the interim rule that the Forest Service's alleged problems with the Rainbow Family in North Carolina in the summer of 1987 were in any way traceable to the *Israel* decision, *see* Report, at 10–11, nor could such a *post hoc* rationale justify the failure to offer the rule for public comment. *Motor Vehicle Manuf. Ass'n v. State Farm Mutual Automobile Insur. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (agency action must be upheld, if at all, on the basis articulated by the agency at the time of the rule making); *Baylor Medical, supra,* 758 F.2d at 1060. The Forest Service obviously could have drafted and published proposed revisions to the regulations for public comment immediately after the *Israel* decision, or even as late as the fall or winter of 1987–1988, had it so desired; but it did not do so, for unexplained reasons.

In short, it appears that the Forest Service has itself been dilatory in failing to offer the proposed revisions to the special use regulations long before now. The magistrate's report states that the record contains "no evidence ... indicating that the Forest Service intentionally delayed this decision [to publish the interim rule] in order to circumvent the usual notice and comment procedure." Report, at 12. On the other hand, the record contains no evidence to excuse the agency's unexplained delay in revising the regulations. There is no requirement that an agency deviously or even willfully have delayed acting, in order

to find that it wrongfully failed to offer regulations for notice and comment—even the most inadvertent delay may still be cause for finding that such regulations have been invalidly promulgated and of no effect. *See U.S. v. Garner*, 767 F.2d 104, 120–21 (5th Cir.1985); *Maine Association of Interdependent Neighborhoods v. Petit*, 659 F.Supp. 1309, 1319 (D.Me.1987); *Ngou v. Schweiker*, 535 F.Supp. 1214, 1216–17 (D.D.C.1982) (Secretary "cannot bootstrap himself into a position of emergency based on his own dilatory conduct" by unexplainedly delaying publication of rule for 32 days after it was approved).

The legislative history to the APA makes clear that the "good cause" exceptions to notice and comment are intended for true emergencies only. " 'Impracticable' means a situation in which the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings...." Senate Rpt. No. 752, 79th Cong., 1st Sess. at 16 (1945), *quoted in American Iron & Steel Institute v. EPA*, 568 F.2d 284, 292 (3rd Cir.1977); *State of South Carolina v. Block, supra*, 558 F.Supp. at 1016. The case law has steadfastly reflected this legislative intention. For example, courts have found "good cause" for omitting public notice and comment where an agency is threatened with impairment of its functioning, *American Transfer & Storage Co. v. ICC*, 719 F.2d 1283, 1292–94 (5th Cir.1983), or needs to provide guidance on imminent hearings, *Arizona State Dept. of Public Welfare v. HEW*, 449 F.2d 456, 481 (9th Cir.1971), *cert. denied* 405 U.S. 919, 92 S.Ct. 945, 30 L.Ed.2d 789 (1972). In other cases, "good cause" has been found when the agency is operating under exceedingly short legislative or judicial timetables. *E.g., Philadelphia Citizens in Action v. Schweiker*, 669 F.2d 877 (3rd Cir.1982) (amendments enacted forty-nine days before "wholesale revisions" of regulations were required to take effect); *American Federation of Government Employees v. Block*, 655 F.2d 1153 (D.C.Cir.1981) (court injunction requiring immediate adoption of regulations, plus threat of severe harm to poultry industry if regulations were not quickly adopted, constitute good cause). "Good cause" has also been found in contexts where quick administrative action is necessitated without prior notice, such as in imposition of price controls or quotas on goods. *Mobil Oil, supra*, 728 F.2d at 1491–92 ("mere announcement" of proposed oil industry rule could cause price discrimination and market dislocations); *DeRieux v. Five Smiths, Inc.*, 499 F.2d 1321, 1332 (Temp.Em.App.), *cert. denied*, 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974) (announcement of future price freeze would create massive rush to raise prices).

By contrast, where the agency has had substantial time in which to offer proposed regulations or rules for public comment or input, courts have refused to find any "good cause" for omitting this requirement, even where—as here—the agency argues that an impending deadline or "emergency" made notice and comment impracticable. *E.g., Kollett v. Harris*, 619 F.2d 134, 145 (1st Cir.1980) (no good cause where agency had fourteen months between legislative enactment and effective date of regulations); *American Iron & Steel Institute v. EPA*, 568 F.2d 284 (3rd Cir.1977) (no "good cause" where EPA knew of duty to promulgate regulations three years before deadline); *Consumers' Union v. Sawhill*, 393 F.Supp. 639 (D.D.C.), *aff'd* 523 F.2d 1404 (Em.App.1957) (more than one year existed between passage of act and final deadline for regulations); *Levesque v. Block, supra*, 723 F.2d at 184 (no good cause where Congress wanted agency to act "with dispatch" in promulgating food stamp regulation revisions, but did not specify a time deadline). Even a six-month deadline has been held sufficient time in which to offer proposed regulations for comment. *U.S. Steel*, 595 F.2d at 214–15; *City of Waco*, 620 F.2d at 86; *Sharon Steel Corp. v. EPA*, 597 F.2d 377 (3rd Cir.1979).

Additionally, as suggested above, where the failure to offer a proposed rule for notice and comment may be attributed to the agency's own dilatory tactics, whether intentional or not, this is a "decisive factor"

in rejecting the agency's claim of "good cause." *Philadelphia Citizens,* 669 F.2d at 885; *Maine Ass'n,* 659 F.2d at 1318; *Wells,* 536 F.Supp. at 1324; *Ngou,* 535 F.Supp. at 1216–17. *See also Mid–Tex Electric,* 822 F.2d at 1132.

In view of the fact that the Forest Service, in this instance, had fully two years after the *Israel* decision in which to act, but did not do so until this late date, the conclusion is inescapable that the agency lacked good cause, under § 553(b), for failing to offer the proposed revisions for public comment and participation *before* they were adopted. The agency has further failed to demonstrate, in any way, why the regulations had to be adopted immediately upon publication, rather than thirty days after publication, as required by § 553(d). Consequently, the interim rule published at 53 Fed.Reg. 16548 was not validly promulgated on either ground, and hence was not effective as of May 10, 1988. The fact that the agency has offered to receive comments for sixty days *after* the effective date of the interim rule will not cure the failure to take public comment in advance. *Levesque v. Block, supra,* 723 F.2d at 187; *New Jersey v. EPA,* 626 F.2d 1038, 1049 (D.C.Cir.1980); *U.S. Steel, supra,* 595 F.2d at 214–15.

The appropriate action for a court to take where a regulation has been improperly adopted, without notice and opportunity for comment, is to declare the regulation ineffective. *Levesque,* 723 F.2d at 186–87; *Consumer Energy Council v. FERC,* 673 F.2d 425, 447–48 (D.C.Cir.1982); *Detroit Edison Co. v. U.S. EPA,* 496 F.2d 244, 248 (6th Cir.1974); *Sannon v. U.S.,* 460 F.Supp. 458, 468 (S.D.Fla.1978); *City of New York v. Diamond,* 379 F.Supp. 503, 515–18 (S.D. N.Y.1974). The remedy for an agency's

failure to allow the thirty-day waiting period, before a final rule takes effect after publication, is to hold the regulation ineffective until the waiting period has run. *Maine Ass'n,* 659 F.Supp. at 1318–19; *Ngou,* 535 F.Supp. at 1216–17. In either case, it is apparent that the interim regulations were not in effect as of May 10, 1988, and are not in effect at this time. Therefore, the interim rule revisions to the special use permit regulations cannot provide the basis for the injunctive relief requested by the government.

### D. *Constitutionality of the Special Use Permit Regulations*

Because the interim rule is presently of no effect, the previously promulgated regulations at 36 C.F.R. Part 251 remain operative, without the revisions proposed in the interim rule. The defendants maintain that both the existing regulations, and as amended by the interim rule, violate their constitutional rights to freedom of speech, assembly, and worship.[2] The following discussion, however, focuses solely on the constitutionality of the existing regulations, and not the interim rule, since the May 10, 1988, revisions have been held ineffective.[3]

■ First, several individual defendants have claimed that, since the National Forest lands are public lands, the government cannot, under the Constitution, impose any restriction or permit requirement upon their freedom to gather, speak, or camp in the National Forests. This position must be rejected out of hand. The National Forest System was established by congressional action, and the Secretary of Agriculture has been delegated powers to prescribe rules and regulations governing the uses of

---

**2.** The defendants have also raised contentions that the special use permit regulations have been unconstitutionally applied to them, out of hostility to their viewpoint or the content of their expressive activity. In light of the holding herein, it is unnecessary to address such contentions regarding application of the regulations at this time.

**3.** To the extent that the proposed revisions to the regulations still manifest the constitutional infirmities identified in the text, with respect to

the existing regulations, the analysis would be equally applicable to the interim rule. It is noteworthy that the public notice and comment required by the APA may reveal precisely this sort of constitutional questionability of a proposed rule, in advance of the rule's adoption, thereby minimizing the possibility that the agency may later find its regulation unenforceable by reason of a judicial determination of unconstitutionality. *See Levesque v. Block,* 723 F.2d at 187–88.

Forest Service lands. *E.g.*, 16 U.S.C. § 472, § 551; 43 U.S.C. § 1740. The power of the Secretary to promulgate and enforce regulations preserving the National Forest environment, including by special use permits, has been repeatedly upheld. *U.S. v. Grimaud,* 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed.2d 563 (1911); *Light v. U.S.,* 220 U.S. 523, 31 S.Ct. 485, 55 L.Ed. 570 (1911); *Sabin v. Butz,* 515 F.2d 1061 (10th Cir.1975); *Osborne v. U.S.,* 145 F.2d 892 (9th Cir. 1944); *Bilderback v. U.S.,* 558 F.Supp. 903 (D.Or.1982). Hence, the defendants must show some specific manner in which the government's regulation of the National Forests infringes upon their constitutional rights, other than the mere act of regulation.

The defendants' further arguments as to the unconstitutionality of the special use permit regulations are two-fold. First, they argue that the regulations (both the existing version and the interim rule) are facially invalid, because they explicitly distinguish between expressive and other types of activity, and, moreover, impose different requirements for obtaining permits based on whether the activity is expressive or not. Second, defendants contend that both versions of the regulations are unconstitutionally vague and standardless, vesting too much discretion in Forest Service officials to deny or approve a permit where expressive activity is concerned, thereby allowing content or viewpoint-based denials of permits to occur. The

court is in agreement with defendants in both respects.[4]

There can be no question that the regulations at 36 C.F.R. Part 251 explicitly distinguish between expressive conduct, which is protected by the First Amendment, and other types of group activity. The definition of a "special event," *vis-a-vis* a "recreation event," and the different statutory procedures for approving or denying a special use permit based upon this dichotomy, demonstrate that the Forest Service has intended to treat expressive activity differently than other types of group activity in the National Forests. Such an explicit regulatory distinction between speech, worship, or associational activity, on the one side, and between other forms of action, on the other side, in and of itself casts the regulatory framework in a highly suspect light. Indeed, as noted by the magistrate's report, this distinction alone appears to underlie the holding of the district court in *United States v. Israel.*[5]

In the view of the magistrate, however, the fact that the regulations distinguish between expressive and other forms of activity is not, alone, sufficient to invalidate them. He concludes that the regulations are "content-neutral," and narrowly drawn to promote significant governmental interests in protecting and regulating use of public lands. The magistrate additionally found that the regulations contain sufficiently precise standards for denial or approval of permits to pass constitutional

---

**4.** It should be noted that the defendants may challenge the constitutionality of the special use permit regulations here, even though they have not, to the court's knowledge, formally applied for or been denied a permit. "Applying for and being denied a license or an exemption is not a condition precedent to bringing a facial challenge to an unconstitutional law." *A.C.O.R.N. v. Munic. of Golden, Colo.,* 744 F.2d 739, 744 (10th Cir.1984). One faced with an unconstitutional law requiring that a permit or license be obtained before engaging in expressive activity "may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license." *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969). Of course, that the government here seeks an injunction requiring the defendants to apply for and obtain a permit before gathering

or meeting on Forest Service lands further heightens the imminent threat to their First Amendment interests. *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

**5.** The *Israel* order, which is unpublished, is not binding upon courts within this jurisdiction. Furthermore, since the order is unaccompanied by an opinion or any other discussion, its precedential value is limited. As the following discussion makes clear, however, this court is fully in agreement with the conclusions reached in *Israel,* that the special use permit regulations are facially invalid, as they apply to expressive activity protected under the First Amendment, but that the Forest Service may otherwise regulate the use of National Forest lands, as regards mass gatherings.

muster, with the exception of § 251.54(h)(2) (which allows denial of permits for events involving expressive activity where the event "would present a clear and present danger to public health or safety"). *See* Report, at 13–19.

Except for his conclusion that the "clear and present danger" criterion for denial of a special use permit for expressive activity is standardless, and thus unconstitutional, the magistrate's further finding, that the regulations are otherwise constitutionally sound, does not appear to be correct, under established First Amendment principles. Hence, for the reasons set forth below, the magistrate's recommendations as to the constitutionality of the special use permit regulations shall be, and they are hereby, adopted in part, with respect to the "clear and present danger" criterion, and rejected in part in all other respects.

■ Although the government apparently disagrees that First Amendment concerns are raised by the special use permit regulations, it cannot reasonably be disputed that the activities in which the defendants seek to engage are "expressive" in nature and accordingly within the ambit of the First Amendment. The record fully reflects that the defendants' anticipated councils, gatherings or meetings in the National Forests will involve significant expressive activity. For example, individual defendants have testified that Rainbow Family gatherings and councils involve exchange of views on many subjects, including political topics, as well as educational seminars and various forms of worship. Moreover, many of those associated with the Rainbow Family view their very participation or association in such events as political statements (for example, some argue for peace and the ecology, while others are in opposition to hierarchical, coercive systems of government). Even the act of camping in the National Forests may have political connotations and qualify as protected symbolic activity. *See, e.g., U.S. v. Abney*, 534 F.2d 984, 985 (D.C.Cir.1976) (per curiam) (sleeping in Lafayette Park in protest vigil is expressive activity); *Clark v. Community for Creative Non–Vio-*

*lence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984) (assuming, but not deciding, that overnight sleeping in connection with demonstration is expressive conduct "protected to some extent by the First Amendment"). Thus, it is unquestionable that rights of speech, worship, and association, closely guarded under the First Amendment, are operative here. *Buckley v. Valeo*, 424 U.S. 1, 25, 96 S.Ct. 612, 637–38, 46 L.Ed.2d 659 (1976) (per curiam) (right of association); *Spence v. Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) and *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (symbolic conduct); *New York Times Co. v. Sullivan*, 376 U.S. 254, 266, 269–72, 84 S.Ct. 710, 718, 720–21, 11 L.Ed. 2d 686 (1964) (expression of views upon public questions and "unfettered exchange of ideas" are highly protected under the First Amendment).

■ It also cannot reasonably be disputed that the public Forest Service lands are the type of forum in which expressive activity has historically occurred, and in which public expression of views must be tolerated to a maximal extent. *E.g., Hague v. C.I.O.*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (use of public streets and parks for exchange of ideas has "from ancient times been a part of the privileges" of citizenship). In contrast to military bases or other government facilities that have been designated for a particular use or function and may be closed to expressive activity, *see United States v. Albertini*, 472 U.S. 675, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985), and *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (military base is nonpublic forum); *Monterey County Democratic Central Committee v. U.S. Postal Service*, 812 F.2d 1194 (9th Cir.1987) (post office is nonpublic forum); *Hale v. Dept. of Energy*, 806 F.2d 910 (9th Cir. 1986) (road leading to atomic energy testing area is nonpublic forum, even though civilians are occasionally allowed to use it), the National Forests are traditionally open to any user seeking to engage in appropriate recreational or other activities, including those involving speech, worship or as-

sociation. *See, e.g., Lyng v. Northwest Indian Cemetery Protective Ass'n,* —— U.S. ——, ——, 108 S.Ct. 1319, 1321–23, 99 L.Ed.2d 534 (1988) (historic use of National Forest sites for Indian religious purposes); *United States v. Beam,* 686 F.2d 252, 256–57 (5th Cir.1982) (describing various groups' use of National Forest System lands in Texas). Regulation of expressive activity in such a forum must therefore be narrowly tailored as to time, place and manner, and serve substantial governmental interests, as well as leave open ample alternative channels of communication. *Clark, supra,* 468 U.S. at 293, 104 S.Ct. at 3069; *Perry Education Association v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45–46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). Any prior restraint on expressive activity in such a context is particularly suspect. *Perry,* 460 U.S. at 45–46, 103 S.Ct. at 955; *Lovell v. Griffin,* 303 U.S. 444, 451, 58 S.Ct. 666, 668–69, 82 L.Ed. 949 (1938).

■ Although duly enacted laws are ordinarily presumed to be constitutional, when a law infringes on the exercise of First Amendment rights, its proponent bears the burden of establishing its constitutionality. *E.g., A.C.O.R.N. v. Municipality of Golden Colo.,* 744 F.2d 739, 746 (10th Cir.1984); *Rosen v. Port of Portland,* 641 F.2d 1243, 1246 (9th Cir.1981); *Espinosa v. Rusk,* 634 F.2d 477, 482 (10th Cir.1980), *summarily aff'd,* 456 U.S. 951, 102 S.Ct. 2025, 72 L.Ed.2d 477 (1982). "Broad prophylactic rules in the area of free expression are suspect. Precision of regulation is the touchstone...." *Schaumberg v. Citizens for Better Environment,* 444 U.S. 620, 637, 100 S.Ct. 826, 836, 63 L.Ed.2d 73 (1980) (quoting *NAACP v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 340–41, 9 L.Ed.2d 405 (1963)).

■ In this light, the explicit regulatory distinction, between expressive activity and all other forms of activity, appears to be in and of itself, an invidious classification by the government, singling out for special treatment the contemplated exercise of free speech, worship, or association. Perhaps most importantly, the facial distinc-

tion between expression and other activity "may have the effect of curtailing the freedom to associate [which] is subject to the closest scrutiny," *NAACP v. Alabama,* 357 U.S. 449, 460–61, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958), by burdening associations planned for expression of views with special requirements not imposed elsewhere. Further, the government is free, under the regulations, to find that a proposed event will be "for the purposes of expression or exchange of views or judgments," 36 C.F.R. § 251.50(1), without any apparent limitation on its discretion. As noted by defendants in their objections, it is the very existence of such power to discriminate, on the basis of a person's expression of views or association with others, which may render a regulation unconstitutional. *Kramer v. Price,* 712 F.2d 174, 177 (1983), *vacated as moot,* 723 F.2d 1164 (5th Cir.1984).

Although it carries a heavy burden to do so, the government has made no effort to explain or to justify why First Amendment activities are viewed differently under the regulations from other forms of activity, or to prove that the exercise of such rights will *not* be treated differently from other forms of activity. It follows that the classification system established by the regulations, which on its face singles out expressive conduct and requires that such conduct be treated differently from other activity, is, in itself, invalid under the First Amendment.

Beyond the fact that the structure of the regulatory scheme targets expressive activity, the regulations do not establish sufficiently precise standards concerning the denial or approval of permit applications where expression is concerned. In circumstances, such as these, where the government requires that a permit or license be obtained before a group of persons may gather to engage in expressive activity, the United States Supreme Court has stated that "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttles-*

*worth v. City of Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969). The constitutional problem with standardless discretion, to approve or deny a permit affecting expressive activity, lies in the fact that such a law "creates a threat of censorship that by its very existence chills free speech." *A.C.O.R.N., supra,* 744 F.2d at 746. Indeed, although not a ground for the court's holding, *see, supra,* n. 2, the record herein and other cases reveal cause for concern about the Forest Service's motive in seeking to enforce the permit regulation against this particular group of defendants. *See United States v. Beam,* 686 F.2d 252, 256–57 & n. 6, n. 7 (5th Cir.1982) (relating officials' testimony that special use permits frequently have not been required of other kinds of group events in Texas in recent years, and that few prosecutions have been undertaken against groups for failing to obtain a permit).

As is well known, the amount of discretion vested in authorities to grant or deny permits for expressive activity, on the basis of vague or even non-existent criteria, has frequently resulted in invalidation of a statute or regulation under the prior restraint doctrine. *See, e.g., Schaumberg,* 444 U.S. at 640, 100 S.Ct. at 838 (Rehnquist, J., dissenting) (reviewing cases); *Hynes v. Mayor of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Shuttlesworth,* 394 U.S. at 151 & n. 2, 89 S.Ct. at 938 & n. 2 (citing cases); *Fernandes v. Limmer,* 663 F.2d 619, 628 (5th Cir.1981), *cert. dismissed,* 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982). In *Shuttlesworth,* for example, a city ordinance required officials to grant a permit for a parade, procession, or demonstration in city streets, unless in their "judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be denied." 394 U.S. at 149–50. The Supreme Court held that the ordinance, "as it was written, conferred upon the City Commission virtually unbridled and absolute power to prohibit any 'parade,' 'procession,' or 'demonstration' on the city's streets or public ways. For in deciding whether or not to withhold a permit, the members of

the Commission were to be guided only by their own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience.'" *Id.,* 394 U.S. at 150, 89 S.Ct. at 938.

In a similar vein, the United States Court of Appeals for the Fifth Circuit has found that a regulatory scheme concerning canvassing and solicitation at the Dallas–Fort Worth Airport was unconstitutional where it vested the airport director with discretion to deny a permit "when there is good reason to believe that the granting of the permit will result in a direct and immediate danger or hazard to the public security, health, safety or welfare." *Fernandes, supra,* 663 F.2d at 631. In the Fifth Circuit's view, this standard of "good reason" for denial of a permit "is indefinite and does not comport with the constitutional requirement that discretion in public officials be specifically and narrowly circumscribed. A before-the-fact determination as to the harmful consequences of an applicant's speech is by this ordinance made a subjective judgment call in the total discretion of the Director. This type of unbridled discretion has been condemned time and time again by the Supreme Court." *Id.*

In *A.C.O.R.N. v. Golden, supra,* a city ordinance was similarly invalidated for lack of precise standards, where it forbade any door-to-door solicitation, poll-taking, or peddling, except for a "charitable, religious, patriotic or philanthropic purpose or otherwise provides a service and product so necessary for the general welfare of the residents of the city that such activity does not constitute a nuisance." 744 F.2d at 741. This language was held to be "not drawn with the requisite narrow specificity, and instead permits exemptions to be granted at the city council's discretion....' [T]he words 'charitable, religious, patriotic, or philanthropic' may be considered vague and indefinite,' and the catch-all 'or otherwise provides' clause 'is uncertain in meaning.'" *Id.,* at 748 (citation omitted). *See also Beckerman v. City of Tupelo,* 664 F.2d 502 (5th Cir.1981) (ordinance allowing chief of police to deny permits if issuance will "provoke disorderly conduct," "will probably

cause an injury," or "create a disturbance" grants too much discretion); *Fantasy Book Shop v. City of Boston*, 652 F.2d 1115 (1st Cir.1981) (permit to be issued where it meets "legitimate protected interests of affected citizens" is too uncertain); *International Society of Krishna Consciousness v. Rochford*, 585 F.2d 263 (7th Cir.1978) (regulations vest too much authority to deny permits in airport director); *Grandco Corp. v. Rochford*, 536 F.2d 197 (7th Cir. 1976) (standard based on whether applicant is "fit and proper person" is invalid); *New York PIRG v. Village of Roslyn Estates*, 498 F.Supp. 922 (E.D.N.Y.1979); *Exotic World News v. Appleton*, 482 F.Supp. 1220 (E.D.Wisc.1980); *Goldstein v. Town of Nantucket*, 477 F.Supp. 606 (D.Mass.1978) (conditioning grant of license on effect of the grant on neighborhood properties is invalid).

The standards in this instance for denial of a special use permit, when expressive activity by a group is concerned (a "special event"), are quoted above, page 14. They allow the Forest Service to deny a permit when, for instance, the "special event would present a clear and present danger to the public health and safety," or the special event "would be of such nature or duration that it could not be reasonably accommodated in the particular place and time applied for," or when the event "would conflict with another use" previously approved by the Forest Service. 36 C.F. R. § 251.54(i)(1)–(3). None of these grounds for denial of a permit is further defined, however—such as the type of "danger" to the public health and safety that is contemplated, when that danger would be "clear and present," or when an event would be determined to "conflict" with some other use of the forests. Neither is there any requirement in the regulations that even a statement of reasons for denial of a permit must be given. Finally, the regulations impose no time frame or deadline for when a special use permit application is to be made, when a decision on such an application must be delivered, or whether any judicial review or appeal is available. *See Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) (constitution requires short deadline for administrative action on application for a permit affecting speech, and opportunity for review); *NAACP Western Region v. City of Richmond*, 743 F.2d 1346 (9th Cir. 1984) (discussing time limit requirement); *Miami Herald Publishing Co. v. City of Hallandale*, 734 F.2d 666 (11th Cir.1984) (no time limit for decision on permit for newsracks invalidates city ordinance).

The magistrate found that these standards for denial of a permit for "special events" are "specific and narrowly drawn criteria [so as] to serve as limits on the discretion of Forest Service officials in denying a permit," with the notable exception of § 251.54(i)(2), which allows denial of permit where the event "would present a clear and present danger to public health or safety." Report, at 17–19. He thus concludes that the regulations, with the noted exception, are constitutional and that the *Israel* order was wrongly decided.

Indeed, under *Shuttlesworth* and *Fernandes*, it is apparent that the "clear and present danger to public health and safety" ground for denial of a special use permit is standardless, and allows Forest Service officials to deny permits for expressive activity based on their subjective, unbridled discretion. Under this criterion, an official is free to speculate as to the likely effect of some act of speech, association or other expressive activity, before it happens, drawing his or her own conclusions as to what the "public health or safety" may be. *Compare Fernandes*, 663 F.2d at 631 ("direct and immediate danger or hazard to the public security, health, safety or welfare" standard is overly vague). Thus, the report and recommendation of the magistrate is correct, to the extent that he concludes that this portion of the regulations is unconstitutional, and his finding is adopted in this respect.

But, his further finding, that the remaining grounds for denial of permits for "special events" are otherwise constitutional, and that the regulations are narrowly and specifically drawn to serve substantial government interests, is not consistent with the analysis employed in such cases as

*Shuttlesworth* or *Fernandes.* In the first place, as noted above, the Forest Service is free to speculate or determine in advance whether a proposed event will be for the "purpose of expression or exchange of views or judgments," and thereby invoke the "special events" permit criteria. Since many—if not all—group activities will naturally involve some expression of views or exchange of judgments, under these regulations an official has virtually unfettered discretion to invoke the "special events" permit application provisions, with their unique criteria for denial of a permit. The lack of standards relative to when a "special event" permit must be applied for, in contrast to all other "special uses," would, alone, be sufficient to invalidate the regulations on vagueness grounds.

Likewise, as with the "clear and present danger" criterion, it would equally be within a Forest Service official's unbridled discretion to determine that a planned event involving expressive activity "would conflict" with some other use of the National Forest, or that it "could not reasonably be accommodated" in a particular time and place applied for. It is easily foreseeable that either rationale could be readily invoked by an official to deny a permit to a group expressing views anathema to the official's own beliefs. And, although the regulations require that if a permit is denied for either of these reasons, the applicant is to be given "the opportunity to accept an alternative site or time" selected by the Forest Service official, 36 C.F.R. § 251.54(i), nowhere do the regulations require that a reason for denial of a permit actually be given; therefore, in many cases it may be impossible to tell what the true grounds were for denying a permit application.[6]

Because these regulations treat expressive activity in a selective manner, the burden is upon the government to establish that they are narrowly drawn, and that the restrictions are reasonable as to time, place, and manner. It has failed to carry those burdens in this instance. The criteria for denial of a special use permit to groups wishing to engage in expressive activity in the National Forests commit the decision regarding approval or denial to the subjective, virtually unfettered discretion of Forest Service officials, with no requirement that they justify or explain any denial of a permit. Under *Shuttlesworth, Fernandes,* and the other cases cited above, the regulations must be struck down as unconstitutional, to the extent that they impose a prior restraint upon the exercise of First Amendment liberties.

■ In so holding, the entire regulatory apparatus concerning special use permits is not being voided. "[A] court should refrain from invalidating more of the statute than is necessary.... '[W]henever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of the court to so declare, and to maintain the act in so far as it is valid.' " *Regan v. Time,* 468 U.S. 641, 652, 104 S.Ct. 3262, 3269, 82 L.Ed. 2d 487 (1984) (plurality opinion), *quoting El Paso & N.E.R. Co. v. Gutierrez,* 215 U.S. 87, 96, 30 S.Ct. 21, 24, 54 L.Ed. 106 (1909). Administrative regulations should be similarly construed to preserve their constitutionality, as far as possible, when a portion of the regulations is found unconstitutional and may be severable without otherwise disrupting the regulations' functions. *Alaska Airlines Inc. v. Brock,* 480 U.S. 678, ——, 107 S.Ct. 1476, 1481, 94 L.Ed.2d 661 (1987); *Jochum v. Pico Credit Corp. of Westbank, Inc.,* 730 F.2d 1041, 1047 (5th Cir.1984); *Rucker v. Wabash RR Co.,* 418 F.2d 146, 149 (7th Cir.1969).

Thus, only those portions of the regulations at 36 C.F.R. Part 251 which refer explicitly to "special events" are held to be

---

**6.** Furthermore, vesting the official with the discretion to propose an alternative place or time for the expressive activity, or his or her own choosing, is highly repugnant to the First Amendment's spirit of allowing citizens the freedom to decide when and where they wish to exercise their rights to speak, worship, or assemble. "One is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State,* 308 U.S. 147, 163, 60 S.Ct. 146, 151–52, 84 L.Ed. 155 (1939).

unconstitutional under the First Amendment—namely, 36 C.F.R. § 251.50(c), to the extent it includes "special events;" § 251.50(1); § 251.53(a), to the extent it includes "special events;" and § 251.54(i). The remaining provisions in the regulations, including the requirement that special use permits be obtained for any "recreation event" or other "special uses" of the National Forest System land or property, remain valid and enforceable.

## E. *Plaintiff's Remedy at Law*

By virtue of the holdings above—that the interim rule is not presently in effect, and that the regulations requiring a special use permit for "special events" are unconstitutional—there is no legal ground for the preliminary injunction demanded by the government. It bears reiterating that the government has solely requested, as preliminary injunctive relief, that the defendants be required to secure a special use permit before they hold or prepare for a Spring Council or Summer Gathering in the National Forests in Texas.[7]

Denial of the plaintiff's motion for preliminary injunction does not, however, deprive it of other remedies at law. A perusal of applicable statutes and regulations discloses that several other remedies are available to the government for the alleged harms to public health and safety, and to National Forest property or lands, which the government sought to forestall through the issuance of a preliminary injunction.

For example, violations of Forest Service regulations (assuming they are valid and constitutional) are punishable by a fine of up to $500.00 and six months imprisonment. 16 U.S.C. § 551; *see also* 36 C.F.R. § 261.16. Available to the Forest Service is an abundance of unchallenged regulations promulgated for the protection of the National Forests and tailored to control the various abuses that the plaintiff fears, and which are wholly unrelated to the special use permit regulations. *See, e.g.,* 36 C.F.R.

§ 261.3 (prohibiting interference with a Forest Service officer engaging in official duties); 36 C.F.R. § 261.4 (prohibiting public disturbances and disorderly conduct); 36 C.F.R. § 261.9 (prohibiting damage to government property or endangered flora); 36 C.F.R. §§ 261.11 and 261.14(q) (regulating the disposal of refuse and sewage); 36 C.F.R. § 261.12(d) (prohibiting the restriction of access to Forest System roads); 36 C.F.R. § 261.14 (protecting developed recreation and camp sites). Forest Service personnel are also conferred the power to make arrests, not only to enforce the Forest Service's own regulations, but also for violations of federal and state drug laws and other criminal conduct. *See, e.g.,* 16 U.S.C. § 559 (power to arrest for violations of Forest Service regulations); 16 U.S.C. § 559b and § 559c (authorizing Forest Service personnel to investigate, and make arrests for, violations of federal controlled substance laws under 21 U.S.C. §§ 801 *et seq.*); 16 U.S.C. § 559d (authorizing Forest Service personnel to cooperate with federal and state law enforcement officials in the enforcement of federal and state controlled substance laws); 16 U.S.C. § 551a (permitting the Forest Service to cooperate with state officials in the enforcement of state laws and local ordinances).

Additionally, 18 U.S.C. § 1853 makes it a substantive misdemeanor unlawfully to cut or injure trees within the jurisdiction of the Forest Service, and 18 U.S.C. § 1863 imposes criminal sanctions on those who trespass upon National Forest Service lands that lawfully have been closed or restricted pursuant to the Service's regulations. In this regard, executive officers of the Service are empowered to close areas of the National Forests, where such action is necessary, for reasons of public health, public safety, fire hazards, or for the protection of threatened vegetation and wildlife. 36 C.F.R. §§ 261.50, 261.52, 261.53. Such officers may limit a variety of conduct by

---

**7.** The injunctive relief requested by the plaintiff is phrased solely in terms of the special use permit regulations. The plaintiff, however, in its complaint, also contends that any anticipated Rainbow Family gathering would constitute a public nuisance. Should the government seek to predicate its demanded permanent injunctive relief on this, or other grounds, it may do so at the final injunction hearing.

restriction and limitation orders, including public nudity. *See* 36 C.F.R. §§ 261.2 and 261.58(j). Besides the criminal sanctions that may be imposed, the Service has the authority to seize, impound, and remove personal property from its forests, in order to protect, and ensure access to, areas within its jurisdiction. 36 C.F.R. § 262.12.

Finally, the Assimilative Crimes Act, 18 U.S.C. § 13, if applicable, would give the plaintiff plenary power to enforce state penal laws within federal lands, whenever such state laws are not displaced by analogous federal statute and regulations, or contrary to federal policy. *See United States v. Fesler,* 781 F.2d 384, 390 (5th Cir.1986), *cert. denied,* 476 U.S. 1118, 106 S.Ct. 1977, 90 L.Ed.2d 661 (1986); *United States v. Brown,* 608 F.2d 551, 553 (5th Cir.1979). Consequently, where statutes of the United States and regulations of the Forest Service do not specifically limit or proscribe conduct, the plaintiff might resort to the penal laws of the State of Texas for authority to maintain public order within its bailiwick.

### Conclusion

Although jurisdiction may be exercised over the defendants named in the government's complaint, the motion for a preliminary injunction must be denied. The regulations under which the preliminary injunction is sought have not been validly adopted, insofar as the May 10, 1988, interim rule is concerned. Moreover, to the extent the regulations distinguish between expressive conduct, such as that at issue here, and other forms of group activity in the National Forests, and to the extent that the regulations do not provide objective and narrowly drawn standards for the issuance or denial of permits for such expressive activity, they are unconstitutional and cannot be enforced.

Further, it appears that the government otherwise has available to it a panoply of statutory and regulatory grounds to prevent the alleged harms posed by a gathering or meeting of twenty-five or more defendants on Forest Service lands. Although these provisions may provide the government with an adequate remedy at law for the harms alleged here, it is unnecessary to pass upon that question at this point.

As set forth in the order entered herewith, a hearing on the plaintiff's motion for a permanent injunction, pursuant to Federal Rule of Civil Procedure 65, shall be conducted on June 13, 1988, in Tyler, Texas. At that time, the plaintiff may offer evidence relating to its contention that the proposed gathering is subject to injunctive relief, in that it will constitute a public nuisance, and may offer evidence regarding any other alleged ground for relief. Similarly, the defendants may offer evidence and arguments in opposition to the government's contentions that a Rainbow Family Summer Gathering in the National Forests of Texas would result in irreparable harm and should be permanently enjoined.

In accordance with the foregoing, it is therefore

ORDERED that the Report of United States Magistrate, dated May 27, 1988, in regards to plaintiff's motion for preliminary injunction, shall be, and it is hereby, adopted in part and rejected in part, as set forth above. It is further

ORDERED that plaintiff's motion for preliminary injunction shall be, and it is hereby, DENIED.