925 F.2d 1088
 Robert J. PARMENTER, an individual; Roger Parmenter, an
individual; Parmenter Brothers, a Partnership, Appellants,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, in its Separate
Corporate Capacity, Appellee.
William HOUSTON, Jr., Appellant,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, in its Separate
Corporate Capacity, Appellee.
John LEIDER, Appellant,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, in its Separate
Corporate Capacity, Appellee.
 Nos. 89-2864 to 89-2866.
 United States Court of Appeals,
 Eighth Circuit.
Submitted Sept. 12, 1990.
Decided Feb. 11, 1991.
 
 Kenneth Cobb, Lincoln, Neb., for appellants.
 Chip Lowe, Des Moines, Iowa, for appellee.
 Before JOHN R. GIBSON, Circuit Judge, ROSS and HENLEY, Senior Circuit Judges.
 HENLEY, Senior Circuit Judge.
 
 
 1
 Robert J. Parmenter and Roger Parmenter, individually, and as Parmenter Brothers, William Houston and John Leider appeal from a judgment of the district court granting summary judgment in favor of the Federal Deposit Insurance Corporation (FDIC). We affirm in part and reverse and remand in part.
 
 BACKGROUND
 
 2
 In April and May, 1986 Richard O'Bannon, secretary/treasurer of the Nebraska Potato Shippers (NPS), entered into contracts with Houston and the Parmenters to lease land to NPS for the 1986 potato harvest. The contracts provided that NPS would pay one-half of the cash rent after the crop was planted and one-half after the crop was harvested. The contracts also provided NPS would pay electrical costs. In August, 1986 O'Bannon entered into an oral agreement with Leider to harvest potatoes for the 1986 crop. Apparently none of the appellants had acquired a security interest in the potato crop.
 
 
 3
 NPS was a loan customer of the Gering National Bank, which held a $720,000.00 perfected security interest in the 1986 potato crop. On July 31, 1986 the Comptroller of the Currency declared the bank insolvent. The FDIC was appointed receiver and acquired the security interest on the crop. During the times relevant to this appeal, Tom Marshall was liquidator in charge, and Lynn Leffert was assistant FDIC bank liquidation specialist in charge. Leffert was responsible for working with debtors of the bank to restructure their debts.
 
 
 4
 The harvest took place in September, 1986. In September, 1988 appellants, who had not been paid in accordance with the lease and harvest agreements, filed suit against the FDIC, alleging that in "August of 1986, Lynn Leffert, an agent of [the FDIC], promised and guaranteed" appellants that they would be paid in accordance with the agreements and in reliance on the promises allowed the harvest to proceed.
 
 
 5
 The FDIC moved for summary judgment, asserting that Leffert had never spoken to appellants in August, 1986 and therefore there was no consideration for any promise of payment and in any event Leffert lacked authority to guarantee payment. In support of its motion the FDIC submitted depositions of appellants, Robert Bulger, Houston's attorney, Leffert and O'Bannon, and documentary evidence. In opposition, appellants relied on the same depositions and the deposition of William Morrow, Houston's banker, and certain documentary evidence. The depositions reveal the following.
 
 
 6
 O'Bannon informed Houston that NPS was in financial trouble and Houston agreed to postpone the first payment until after the harvest. Shortly after the FDIC was appointed receiver, O'Bannon told Houston that he had talked to Leffert and that when NPS and the FDIC had reached a settlement concerning NPS's loan Houston would be paid from the proceeds of the sale of the potatoes. Houston stated that he "presumed" that the FDIC would make the payment. Thereafter Houston had several other conversations in which O'Bannon assured him that he would be paid from the sale proceeds. Houston stated that he had never talked to Leffert, but after the harvest his lawyer, Robert Bulger, and his banker, William Morrow, had telephoned Leffert to inquire when Houston would be paid. Houston was present in Bulger's office when Bulger and Leffert were speaking on the telephone on December 18, 1986. According to Houston, who heard only Bulger's end of the conversation, after the conversation Bulger told him that he would be paid from the proceeds. Houston again "presumed" that the FDIC would be responsible for payment because "common sense" told him that the FDIC had control over NPS. Houston acknowledged that because he had never personally talked to Leffert, Leffert "couldn't very well promise" payment, but believed that Leffert had guaranteed payment to Bulger and Morrow.
 
 
 7
 Bulger could not remember the details of the telephone conversation with Leffert, but recalled that Leffert stated that he needed more information before he "could see about" Houston getting paid. In a letter of December 18, 1986, Bulger supplied the requested information, but did not subsequently hear from Leffert. Bulger informed Houston to pursue the matter and advised him that resolution would probably be dependent upon the likely bankruptcy of NPS.
 
 
 8
 Morrow talked to Leffert by telephone in November, 1986. Morrow indicated that Leffert said that the FDIC and NPS had a plan to permit payment of all bills in full, that the FDIC would authorize payment from proceeds of the sale of the crop, and that landlords had "high priority." Morrow stated that Leffert had told him to tell Houston to contact NPS so that his rent claim would receive immediate consideration because the claim would not be paid as an ordinary business expense. Morrow stated that he did not inquire about Leffert's position at the FDIC or details of the plan with the NPS.
 
 
 9
 The Parmenters also agreed to allow O'Bannon to postpone the first payment. Roger Parmenter stated that before the harvest O'Bannon had assured him that the FDIC would release payment from the proceeds of the sale of the crop, but he was not completely satisfied because he did not trust the FDIC. According to Roger, in early December he contacted Leffert who told him that the FDIC and NPS were working out a plan and that he would be paid in a couple of weeks. Roger, however, stated he was uncertain who would pay him. After talking to Leffert, on that same day Roger spoke with an attorney, who advised him it was too late to file a lien.
 
 
 10
 Robert Parmenter stated that approximately one week after the bank closed he talked with O'Bannon who had informed him that NPS was working with the FDIC but there was not "any clear picture exactly what was going on," but subsequently O'Bannon told him that the FDIC would keep NPS in business and there was enough cash flow projected to pay all NPS's creditors. On September 21 or 22 Leider and O'Bannon's brother Randy came to the field to begin the harvest. Robert told Randy that he would refuse to allow the harvest if he was not guaranteed payment. Randy again assured him he would be paid and told him if he wanted more assurance to contact Leffert. Robert then called Leffert, and according to Robert, Leffert told him there was no problem with payment. The next day the harvest began. Robert, however, stated that he never inquired if Leffert had authority to guarantee payment, but assumed he was the "head man."
 
 
 11
 On September 29, 1986 O'Bannon gave Leider a check for $15,000.00. Leider stated he "knew" the check was from the FDIC. When he asked O'Bannon for the rest of the money, O'Bannon told him to visit Leffert. Leider stated that on December 18, 1986 he visited Leffert at the bank. According to Leider, Leffert told him that pursuant to the "deal" that the FDIC had with NPS everyone would get paid, and told him that there was no reason to seek legal representation. Leider stated he did not ask Leffert if he had authority to guarantee payment, but believed Leffert had control of NPS because of the check and O'Bannon had told him that Leffert had control. Despite Leffert's assurances that he need not contact an attorney, Leider did so, and the attorney advised him he could not file a lien.
 
 
 12
 In his deposition, O'Bannon stated that he met with Leffert approximately two weeks after the bank closed to discuss repayment of NPS's overdue loan. He told Leffert he would do "whatever it took to make things work" and left the meeting with a "good feeling." O'Bannon stated that although nothing substantive was discussed at the first meeting, he thereafter met with the landlords to tell them that NPS was working with the FDIC and that he believed that they would be paid as they had been in the past. O'Bannon stated that the FDIC did not tell him to talk to the landlords, and he did so on his own behalf because that was his way of "doing business," and that he had met with the landlords several times before the harvest. O'Bannon stated that before the harvest the FDIC did not specifically discuss how the landlords were to be paid and there was never any discussion about the FDIC releasing its security interest. O'Bannon also stated that before the harvest, NPS did not need the FDIC approval to pay bills, but did so after the harvest.
 
 
 13
 At subsequent meetings with Leffert and Mike Jacobs of the FDIC, O'Bannon informed them that he needed $60,000.00 for partial payment of harvesting costs, including payment to the truckers and $15,000.00 for Leider for fuel costs. Although O'Bannon first stated that he thought he had obtained the money from the FDIC, he later acknowledged that he had executed a promissory note on September 29, 1986 with Scottsbluff National Bank and that the FDIC had executed an indemnity agreement with the bank in which the FDIC agreed to subordinate its lien on the crops to the bank. O'Bannon also supplied the FDIC with projected costs of and income from the harvest, including $126,000.00 for landlord rents. Before the harvest, he projected income of $1.3 million and after the harvest income of approximately $940,000.00, but that the gross income was $886,143.00 due to a poor yield.
 
 
 14
 According to Leffert, the FDIC's position in regard to NPS was to allow NPS to pay its suppliers for the inputs of the 1986 harvest to the extent there was sufficient income from the sale of the crop and that the position was based on projections supplied by O'Bannon. Leffert stated that O'Bannon's projections indicated there would be sufficient proceeds to pay all of the creditors who supplied inputs for the 1986 crop and to pay all the secured creditors in the order of the priority of their liens. He stated that before the harvest he believed that NPS would be able to obtain bank financing and continue as an ongoing business, but after the harvest realized that the company would have to be liquidated.
 
 
 15
 Leffert could not remember any of the conversations with appellants. Leffert stated that under his delegation of authority he could not guarantee payment or release proceeds, other than what was provided in the indemnification agreement. Leffert stated that no landlord had told him that he would not allow the harvest absent a guarantee of payment, but if any had done so, he would have had to recommend to the FDIC either payment or abandonment of the crop, depending on which would be the most prudent, and wait for approval.
 
 
 16
 Leffert explained that in a December 13, 1986 memorandum to David Nielsen, supervisory liquidation specialist in the Kansas City regional office, he recommended payment to landlords, stating that "if word gets out in any community that landlords are not being paid, [the FDIC] will be prevented from harvesting crops." In the memo, Leffert noted that "the argument has been advanced: 'Why should these suppliers or inputs be paid 100% when the FDIC is only going to get some discounted percentage of its debt?' " Leffert believed the response to the argument was that "if the 'operating cycles' are not paid in full in each year, the business cannot continue so that it can recover any of the money invested...." Leffert believed "by allowing the 'operating cycle' to operate in an effective manner, [the FDIC] will recover a far larger portion of [its] money than [it] would [by] allowing the 'operating cycle' to break down."
 
 
 17
 The magistrate recommended granting the FDIC's motion for summary judgment against all appellants, except for Robert Parmenter. The magistrate found that the undisputed evidence was that none of the appellants, except for Robert, had spoken to Leffert before the harvest and therefore there was no consideration for any post-harvest promise Leffert might have made. The magistrate reasoned that once the crop was harvested there was no benefit to the FDIC or detriment to appellants. See Bock v. Bank of Bellevue, 230 Neb. 908, 913, 434 N.W.2d 310, 314 (1989). The magistrate also suggested that even if there was a benefit to the FDIC from a post-harvest promise, there could be no contract because of lack of mutuality of obligation, in that there would be no "corresponding obligation on the part of [appellants] to do anything." See De Los Santos v. Great Western Sugar Co., 217 Neb. 282, 285, 348 N.W.2d 842, 845 (1984). The magistrate also found there was no past consideration for the alleged promises of payment, because there was no agreement between the FDIC and appellants to which the alleged subsequent promises related back. Stuht v. Sweesy, 48 Neb. 767, 768, 67 N.W. 748, 750 (1896).
 
 
 18
 The magistrate rejected appellants' argument that O'Bannon was the FDIC's agent, noting that under Nebraska law appellants would have had to establish that both O'Bannon and the FDIC had consented to O'Bannon's acting on behalf of the FDIC and that the FDIC controlled O'Bannon. See Dunn v. Hemberger, 230 Neb. 171, 180, 430 N.W.2d 516, 522 (1988). The magistrate found no evidence to create a jury question on the matter of consent, relying on O'Bannon's testimony that he was acting on his own behalf when he contacted appellants regarding payment.
 
 
 19
 However, the magistrate believed summary judgment was inappropriate as to Robert Parmenter because there was a question of fact whether there was sufficient consideration to support the alleged pre-harvest promise. The magistrate further found that although there was no issue of fact as to Leffert's apparent authority, the magistrate believed there was a jury question whether Robert could equitably estop the FDIC from asserting Leffert's alleged lack of authority.
 
 
 20
 The district court adopted the magistrate's report in part and rejected it in part. The court granted summary judgment against all appellants. The court disagreed with the magistrate as to equitable estoppel, holding that it was inapplicable because there was no evidence of any of the traditional elements of estoppel, including a showing that the FDIC's conduct amounted to a false representation or concealment of material facts. See O'Neill Prod. Credit Ass'n v. Mellor, 220 Neb. 555, 558, 371 N.W.2d 265, 267 (1985).
 
 ANALYSIS
 
 21
 At the outset, we note that "[s]ummary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds." AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir.1987). "The judge's function is not to weigh the evidence, but rather is to determine as a matter of law whether there are genuine factual conflicts." Id. "In making this determination, the court is required to view the evidence in the light most favorable to the non-moving party and to give that party the benefit of all reasonable inferences to be drawn from the underlying facts." Id. Although this court reviews a judgment of a district court granting summary judgment de novo, we defer to the district court's interpretation of applicable state law. Economy Fire & Cas. Co. v. Tri-State Ins. Co., 827 F.2d 373, 375 (8th Cir.1987).
 
 
 22
 Appellants first argue that the district court erred in holding that there was no consideration for Leffert's alleged post-harvest promises to pay. "There is sufficient consideration for a promise if there is benefit to the promisor or any detriment to the promisee." Bock v. Bank of Bellevue, 230 Neb. at 913, 434 N.W.2d at 314. Appellants argue that there was sufficient consideration in that they suffered detriment by forbearing from filing liens in reliance on the alleged promises of payment. "In order for a detriment to the promisee to constitute valid consideration for a ... contract, it must have been within the express or implied contemplation of the parties and known to and agreed to by them." Schrempp v. Gallup, 210 Neb. 415, 418, 315 N.W.2d 248, 250 (1982) (quotation omitted). In Schrempp the court found that summary judgment was inappropriate because there was a substantial question of fact as to whether plaintiff's forbearance was within the contemplation of the parties and agreed to by them. Id.
 
 
 23
 In this case, there is no such question of fact. Appellants did not forbear from filing liens because of Leffert's alleged representations. Leider and Roger Parmenter sought legal advice after meeting with Leffert, and their attorneys informed them that they could not file liens. After talking with Leffert, Houston's attorney supplied Leffert with information and advised Houston to "pursue" the matter. Therefore, the district court did not err in holding that the alleged post-harvest promises of payment were not supported by adequate consideration.[1]
 
 
 24
 The FDIC does not challenge the district court's finding that there was consideration as to Leffert's alleged pre-harvest promise of payment to Robert Parmenter, but argues that the judgment should be affirmed on the ground that Leffert lacked authority to make any promise of payment. Robert contends that Leffert had actual authority to guarantee payment. He asserts that a publicly filed power of attorney conferred the necessary authority, in that the power of attorney granted Leffert the authority to "[d]o and perform every act necessary for the use, liquidation or collection of the Acquired Assets held in the name of the FDIC." Because Robert's argument is raised in his reply brief, the FDIC has not had an opportunity to respond to the argument. Generally, this court does not address arguments initially raised in reply briefs. See Hawkins v. Minnesota Mining & Mfg. Co., 601 F.2d 362, 363 (8th Cir.1979). In this case, however, we believe in the interests of justice, a remand is required for the district court to address the question of whether the power of attorney granted Leffert actual authority to promise payment.[2] See also Stafford v. Ford Motor Co., 790 F.2d 702, 706-07 (8th Cir.1986) (interests of justice required remand for district court consideration of issue raised on appeal).
 
 
 25
 A remand, however, would be unnecessary if Robert prevailed on his alternative arguments concerning Leffert's authority. Robert argues that even if the delegation of authority did not confer the necessary authority, Leffert had authority pursuant to 12 C.F.R. Sec. 303.10(a)(1), which provides:
 
 
 26
 Except ... with respect to matters which generally involve conditions or circumstances requiring prompt action in the field for the better protection of the interest of the FDIC and to achieve flexibility and expedition in its operations and in the exercise of its functions in connection with the FDIC's litigation and liquidation matters ..., the Board of Directors does not delegate its authority and no delegations of final authority are made by the Board of Directors....
 
 
 27
 Robert reasons that the potatoes were a perishable crop which required Leffert's "prompt action" on the day of the harvest to ensure the harvest would proceed and thereby protect the FDIC's interest in the crop. The FDIC responds that this court should reject Robert's interpretation, because it is unaccompanied by analysis. The FDIC, however, also does not provide analysis for its assertion that the regulation does not confer the necessary authority. In fact, the FDIC does not address the "prompt action" exception, but only asserts that Leffert's delegation of authority did not confer the necessary authority.[3]
 
 
 28
 We are inclined to agree with Robert that the plain language of the regulation gave Leffert the authority to guarantee payment on the day of the harvest in order to protect the FDIC's interest in the crop. See KCMC, Inc. v. FCC, 600 F.2d 546, 552 (5th Cir.1979) (court looked no further than plain language of regulation in rejecting agency interpretation). We, however, note that Sec. 303.10(a)(1) is part of a detailed regulatory system concerning FDIC's delegation of authority. See 12 C.F.R. Secs. 303.7-10. Given that "[t]he parties ... have not addressed this question in detail ... and that these regulations are particularly abstruse, we hesitate to decide the question on the scanty record before us[,]" Berkovitz v. United States, 486 U.S. 531, 545, 108 S.Ct. 1954, 1963, 100 L.Ed.2d 531 (1988), but believe the district court, if necessary, should address the issue on remand. If the court does not find that the power of attorney conferred the necessary authority, it should decide whether Sec. 303.10(a)(1) conferred authority.[4]
 
 
 29
 Robert also argues that even if Leffert did not have actual authority he had apparent authority or that the FDIC should be equitably estopped from asserting lack of authority. We disagree. " 'The doctrine found in agency law of apparent authority does not apply to the government.' " Pia v. United States, 7 Cl.Ct. 208, 211 (1985) (quoting Lehner v. United States, 1 Cl.Ct. 408, 415 (1983)), aff'd, 818 F.2d 876 (Fed.Cir.1987). See also Hicks v. Harris, 606 F.2d 65, 68 n. 4 (5th Cir.1979) (apparent authority inapplicable against government). In addition, in light of OPM v. Richmond, --- U.S. ----, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990), we note that the application of equitable estoppel to the facts of this case is questionable. In Richmond the Supreme Court held that the government could not be equitably estopped so as to entitle a claimant to a monetary payment not otherwise authorized by law, because to do so would violate the appropriations clause of the Constitution. The Court stated "[t]o open the door to estoppel claims would only invite endless litigation over both real and imagined claims of misinformation by disgruntled citizens, imposing an unpredictable drain on the public fisc." Id. 110 S.Ct. at 2476. Although the Court left "for another day whether [a non-monetary] estoppel claim could ever succeed against the Government[,]" it indicated it was unlikely. Id. at 2471.
 
 
 30
 In any event, it has been held the "government [cannot be] estopped from asserting lack of authority as a defense." United States v. Killough, 848 F.2d 1523, 1526 (11th Cir.1988). This court has stated " '[w]hatever form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority.' " Leimbach v. Califano, 596 F.2d 300, 305 (8th Cir.1979) (quoting Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947)). In this case, Robert stated that he never inquired whether Leffert had actual authority, and "[b]y not inquiring ... assumed the risk that [Leffert] was acting within his authority." Miles Farm Supply, Inc. v. United States, 14 Cl.Ct. 753, 757 (1988).[5]
 
 
 31
 In conclusion, we hold that as to Leider, Houston, and Roger Parmenter, the district court did not err in granting summary judgment in favor of the FDIC because the alleged post-harvest promises of payment were not supported by consideration.[6] As to Robert Parmenter,[7] we reverse the judgment of the district court and remand for determination of whether Leffert acted within the scope of his actual authority when he made the alleged pre-harvest promise of payment.
 
 
 32
 Accordingly, we affirm the judgment of the district court in part and reverse and remand in part for further proceedings consistent with this opinion.
 
 
 
 [1]
 Appellants also suggest there was consideration because the FDIC benefitted from the alleged post-harvest promises of payment. However, as the magistrate indicated, such an argument fails because of lack of mutuality of obligation. "Mutuality is absent when one only of the contracting parties is bound to perform, and the rights of the parties exist at the option of one only." De Los Santos v. Great Western Sugar Co., 217 Neb. at 285, 348 N.W.2d at 845 (quotation omitted). We also find appellants' reliance on Elson v. Nelson, 132 Neb. 532, 272 N.W. 551 (1937) of no avail. In Elson the court held "that where the leading object of a party, promising to pay the debt of another, is to promote his own interest and not to become a guarantor, and the promise is supported by good consideration, it will be valid although not in writing." 132 Neb. at 534, 272 N.W. at 552 (quotation omitted). The court did not discuss what constitutes "good consideration," but it appears consideration was found in plaintiff's completion of performance based on defendant's promise of payment
 We also reject appellants' assertion that there was sufficient evidence to create a factual dispute whether O'Bannon was acting as an agent of the FDIC when he assured appellants before the harvest that they would be paid. We first note that there is no delegation of authority in the record. This court has held that an agent of the United States must act within his delegated authority. St. Louis Union Trust Co. v. United States, 617 F.2d 1293, 1300 n. 7 (8th Cir.1980). It has also been held that apparent authority does not apply to government agents. Pia v. United States, 7 Cl.Ct. 208, 211 (1985), aff'd, 818 F.2d 876 (Fed.Cir.1987). In any event, contrary to appellants' assertion that the FDIC "told O'Bannon to go out and do whatever he had to do to get the potatoes out of the ground," the evidence reveals that O'Bannon did not make the assurances at the FDIC's urging, but made them because it was "his way of doing business." Because we find that O'Bannon was not an agent of the FDIC, we also reject appellants' argument that the FDIC ratified O'Bannon's actions. See H. Rueschlein & W. Gregory, The Law of Agency and Partnership, Sec. 27, at 73 (2d ed. 1990). ("[I]f no agency relationship exists at all, the doctrine of ratification does not apply.")
 
 
 [2]
 The district court apparently rejected Robert's arguments concerning actual authority, but did not provide reasons for its rejection, as it did in rejecting appellants' arguments concerning apparent authority and equitable estoppel
 
 
 [3]
 In its brief the FDIC states:
 this [regulation] puts the [appellants] on notice that, except in the case of actions in the field, the Board of Directors does not specifically delegate its authority to anyone and no delegations of final authority are made. In the cases involving litigation and liquidation matters, the Board may delegate some of its authority and indeed such a delegation was conferred on Lynn Leffert by the memorandum of August 8, 1986. It did not include any authority to the liking of the [appellants].
 
 
 [4]
 If the court finds that the regulation gave Leffert the authority to promise payment, we would agree with Robert that there is a question of fact whether Leffert was acting within the scope of his actual authority. See AgriStor Leasing v. Farrow, 826 F.2d at 734 (whether act is within scope of agent's authority ordinarily question of fact). Although Robert stated that he did not expressly inform Leffert that he would not allow the harvest to proceed absent a guarantee of payment, the record viewed as a whole supports a reasonable inference that Leffert was aware that unless he guaranteed payment Robert would not allow the harvest to proceed and thus jeopardize the FDIC's security interest in the crop. Testimony of other witnesses buttresses this conclusion. For example, Leider was asked "Did [Robert] refuse to allow you to harvest the potatoes until the FDIC agreed to pay ...?" Leider responded "Yes." Furthermore, O'Bannon was at the FDIC's office when Robert placed the telephone call to Leffert. O'Bannon heard Leffert assure Robert that he would be paid and stated "the next thing I know the next morning we were digging potatoes."
 
 
 [5]
 Robert also suggests that the FDIC ratified Leffert's actions. "For effective ratification, a superior must have authority to ratify, knowledge of a subordinate's unauthorized act, and then must confirm, adopt, or acquiesce to the unauthorized action of his subordinate." California Sand & Gravel, Inc. v. United States, 22 Cl.Ct. 19, 27-28 (1990). There is no evidence in the record that anyone with authority in the FDIC to guarantee payment was aware of Leffert's actions or acquiesced to them
 
 
 [6]
 Although we affirm as to these appellants, we are sympathetic. Appellants not only have not been paid for leasing their land and harvesting the crops, but also have not been paid for electricity and apparently for gasoline and fertilizer they provided pursuant to the lease and harvest agreements. It is, however, the "court's duty to follow the law, not make new law because of sympathy with plaintiffs' plight arising from the factual situation at bar." Miles Farm Supply, Inc., 14 Cl.Ct. at 756 n. 8 (quotation omitted)
 
 
 [7]
 Given that on appeal the FDIC assumes that the claim of Robert Parmenter includes the claim of the Parmenter Brothers, we also reverse and remand as to the Parmenter Brothers. On remand, the district court may wish to explore this issue