## Norfolk

### ERNEST THOMAS HALL

v.

### COMMONWEALTH OF VIRGINIA

No. 1780-89-1

Decided July 23, 1991

COUNSEL

Craig Preston (Preston & Grillo, on brief), for appellant.

Leah A. Darron, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

Opinion

**MOON, J.**—We consider whether the "traffic-checking detail" guidelines appropriately limited the discretion of the trooper so that the stop of the defendant was "reasonable" under the fourth amendment. Because the guidelines did not properly limit the officer's discretion, we reverse Ernest Thomas Hall's conviction for driving after having been declared an habitual offender which was based upon evidence obtained from the stop.

To ensure that an individual's expectation of privacy is not subjected to arbitrary invasion solely at the unfettered discretion of police officers in the field, seizures at roadblocks must be carried out pursuant to plans embodying explicit, neutral limitations on the conduct of the individual officer. *Simmons v. Commonwealth*, 238 Va. 200, 202-03, 380 S.E.2d 656, 658 (1989); *Lowe v. Commonwealth*, 230 Va. 346, 350, 337 S.E.2d 273, 276 (1985), *cert. denied*, 475 U.S. 1084 (1986); *see Michigan Dep't of State Police v. Sitz*, 496 U.S. 444 (1990); *Delaware v. Prouse*, 440 U.S. 648 (1979).

Ernest Thomas Hall was stopped on June 8, 1989, by a traffic checking detail at the intersection of Routes 657 and 658 in Accomack County, Virginia. As a result of the evidence obtained at the stop, he was charged and subsequently convicted of driving after having been declared an habitual offender. He maintains that the traffic detail did not meet the prerequisites of *Lowe* because too much discretion was left to the officers who conducted the detail.

Police First Sergeant C.E. Murphy testified that Virginia State Police Memo 1987-#3 prescribes the guidelines for state police conducted "traffic-checking details." The purposes of the details were to "enforce operators' license and vehicle registration laws, and to take appropriate action to all other violations of the law coming to the attention of our members." Pursuant to the guidelines, Sergeant Murphy designated fifty-four locations in Accomack where "checking details" could take place. Murphy was required to consider specified criteria in choosing the sites, and he personally inspected each site. Safety to the public and those conducting the roadblock was of primary importance in selecting a site. Approved site number twenty-nine was listed as the "intersection of Route 657 and Route 658."

Under the guidelines, troopers are authorized to conduct "traffic-checking details" only "when assigned by a supervisor." A weekly work schedule was drawn up for the state troopers assigned to patrol Accomack County by Virginia State Police Sergeant Evans, and approved by Sergeant Murphy. Each week, one or two troopers would be ordered to conduct a "checking detail." That officer was required to select the site for the "traffic-checking detail" from the approved list. The officer, in his sole discretion, determined the time for conducting the "checking detail" based upon work shift, the number of officers available to assist, anticipated traffic, court appearances, and other work-related criteria.

The guidelines specified that the officer was required to conduct the "checking detail" for no less than thirty minutes and no more than two hours. The guidelines also dictated how the officer would conduct the "detail." Upon completing the "detail," the officer was required to complete a form giving the place, time and duration of the "checking detail," the number of vehicles stopped, the number of warnings or summonses issued, and the number of arrests made and the reasons therefor. The completed form had to be approved by Sergeant Murphy or another supervisor.

Finally, the guidelines required Sergeant Murphy to file an annual report stating the number and location of "checking details" in Accomack County approved for the year. One purpose of this report was to ensure that "checking details" are not held at one location but are spaced out among the available sites throughout the county.

The evidence showed that the guidelines were in place and followed when Trooper D.A. Towles conducted his detail on June 8, 1989 for fifty minutes at approved site number 29, the intersection of State Routes 657 and 658. From 1:20 until 2:10 p.m. Towles stopped every car, thirteen cars in all, including Hall's vehicle.

At the suppression hearing, Hall alleged that the "traffic-checking detail" guidelines were constitutionally flawed because Trooper Towles had the authority to select his "checking detail" site from fifty-four pre-approved sites, and to decide exactly when to conduct the detail during the week his superiors had ordered him to do so. We agree.

The trial court found that "the fact that the time [for the stop] is left to . . . [the trooper ordered to conduct the 'detail'] does not give . . . [the trooper] unbridled discretion." However, not only was the time left to the discretion of the trooper, but the trooper was able to select from one of fifty-four sites.

While his discretion may have not been totally "unbridled" or "unfettered" because he was limited to conducting the "detail" at one of fifty-four points, we hold that the plan unnecessarily left the individual trooper with such broad discretion that it was subject to abuse. In order to determine whether the discretion was impermissibly broad, we consider what an officer might do within the guidelines. Accomack County is not so large that fifty-four checkpoint stops constitute a significant limitation. A police officer who decided to stop a particular person could do so within these guidelines by ascertaining at what time that person would travel through a particular intersection and set up a roadblock accordingly. Also the officer could observe an individual he wishes to stop, overtake and pass the individual's vehicle, and activate the check point before the individual approaches.

Here, Sergeant Murphy justified the broad delegation of discretion to the officer in the field by saying:

> It would be hard for the supervisor to sit at the office and tell a trooper which intersection he should be at because a trooper patrols that area each day. He knows how the traffic volume goes. He knows when would be the proper time to hold a checking detail as far as the traffic flow; if he is suppose to hold by himself or another officer.

However, if these considerations are the determining factors for activating a check point, they are known hours, if not days, in advance. Even though the field officer may have a better idea of which of the fifty-four particular points might be the best to set up the road checks and when they should be activated, the amount of discretion in this plan exceeds the limitations permitted by law. The record does not show that the conditions which prompted selection of a particular check point at a particular time could not have been communicated to a supervisor with the supervisor making the ultimate selection of the site and time. This procedure would ensure that officers would not have the unbridled authority to activate a particular check point to stop a particular

individual.

Although the plan did contain limitations on the exercise of the police officer's discretion, the broad discretion which the officer had as to the time and location of the checkpoint failed to meet the test in *Delaware v. Prouse.*

The judgment appealed from is reversed.

*Reversed and dismissed.*

Barrow, J., and Coleman, J., concurred.