Tracie **PARK, Plaintiff,**

v.

The **FOREST SERVICE OF the UNITED STATES of America, et al., Defendants.**

No. 96–3288–CV–S–RGC.

United States District Court, W.D. Missouri, Southern Division.

June 11, 1999.

Order Denying Motion to Amend Judgment
Aug. 16, 1999.

Fred Slough, Slough, Connealy, Irwin & Madden, Kansas City, MO, Stephen Douglas Bonney, Bonney Law Offices, Kansas City, MO, for Plaintiff.

Allen C. Vanbebber, Overland Park, KS, Charles M. Thomas, Assistant U.S. Atty., Kansas City, MO, for Defenddant Forest Service.

Geoffrey W. Preckshot, Mo. Atty. Gen. Office, Jefferson City, MO, David James Hansen, Mo. St. Highway Patrol, Jefferson City, MO, for Defendant Mills.

Ray Lee Caskey, Caskey Law Office, Alton, MO, for Oregon County.

### ORDER & INJUNCTION

RUSSELL G. CLARK, Senior District Judge.

On July 23, 1996, plaintiff Tracie Park ("Park") filed a complaint with this Court, seeking an injunction to prevent the Forest Service of the United States ("Forest Service") from establishing roadblocks near the entrance of Rainbow Family gatherings in the Mark Twain National Forest without first obtaining a warrant. Park alleges in her complaint that the Forest Service, together with the other defendants, impinged on the rights guaranteed to her by the First and Fourth Amendments of the United States Constitution. Park contends that the roadblock constituted an unreasonable seizure and its location unfairly targeted the Rainbow Family, a group exercising their right to assemble and speak freely.

Park has filed a motion for summary judgment, as have defendants Oregon County, Mike Wilhoit, acting in his official capacity as the Superintendent of the Missouri State Highway Patrol, and the United States Forest Service. All of the parties have responded to the opposing motions. For the reasons stated below, the Court will dismiss plaintiff's claims against defendants Oregon County and Mike Wilhoit, the Superintendent of the Missouri State Highway Patrol, because the plaintiff is without standing to pursue her claims against those parties. However, the Court will grant plaintiff's motion for summary judgment against the Forest Service because the actions of the Forest Service impermissibly violate Park's rights under the Fourth Amendment to be free from unreasonable seizures.

### I. SUMMARY JUDGMENT STANDARD

There are well settled principles in ruling on a motion for summary judgment. Summary judgment is appropriate when there is no genuine issue of material fact present in the case and judgment should be awarded to the party seeking the motion as a matter of law. *Langley v. Allstate Insurance Co.*, 995 F.2d 841, 844 (8th Cir. 1993). Because the summary judgment remedy is drastic, it should not be granted unless the moving party has established the right to a judgment with such clarity that there is no room for controversy. *Umpleby v. United States*, 806 F.2d 812, 814 (8th Cir.1986). However, as the Supreme Court noted in *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole ...."

In order for a motion for summary judgment to be defeated, the nonmoving party

must resist the motion by making a sufficient showing on every element of its case on which it bears the burden of proof, *Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1090 (8th Cir.1992), and the factual dispute "must be outcome determinative under prevailing law." *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir.1992). The Supreme Court has held that summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548. However, such a motion is to be viewed in the light most favorable to the opposing party who also must receive the benefit of all reasonable inferences to be drawn from the underlying facts. *Johnson v. Minnesota Historical Society*, 931 F.2d 1239, 1244 (8th Cir. 1991).

The standard for granting a motion for summary judgment is similar to that of a directed verdict: the evidence must be such that a reasonable jury could not return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Westchem Agricultural Chemicals, Inc. v. Ford Motor Co.*, 990 F.2d 426 (8th Cir.1993). Summary procedures are appropriate where the issues for resolution are primarily legal rather than factual. *Parmenter v. Federal Deposit Insurance Corp.*, 925 F.2d 1088, 1092 (8th Cir.1991). Issues of fact must be material to a resolution of the dispute between the parties; where the only disputed issues of fact are immaterial to the resolution of the legal issues, summary judgment is appropriate. *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir.1992). In ruling on a motion for summary judgment, the Court does not decide material fact issues, rather

it determines whether or not they exist. *Parmenter*, 925 F.2d at 1092.

## II. BACKGROUND

### A. *The Rainbow Family Tribe*

The Rainbow Family is a loose-knit network of people who gather each year to—as they describe it—"give honor & respect to all those who have aided the positive evolution of earth & humankind." Suggestions in Support of Plaintiff's Motion for Summary Judgment Exhibit A (Rainbow Guide), at ii [hereinafter "Plaintiff's Support"]. The Rainbow Family makes an annual summer pilgrimage to a National Forest, as well as holding smaller regional gatherings periodically in various locations. Plaintiff's Support Exhibit C, Affidavit of Tracie Park. The summer gathering is always held around the Fourth of July, so that from sunrise to noon on the Fourth, attendees at the gathering can "meditate for World Peace & Healing the Earth." Plaintiff's Support Exhibit A.

However, this pursuit of peace is not without its problems. Conflicts arise between the Rainbow Family and the Forest Service. One of the major problems has been the insistence of the Forest Service that the Rainbow Family obtain a special use permit for their gatherings. The Rainbow Family maintains that their "non-hierarchical structure gives nobody the authority to sign such a thing" and that they are merely exercising their right to assemble peaceably, as guaranteed by the First Amendment of the United States Constitution. Plaintiff's Support Exhibit A. These contentions are apparently not without support. Two federal judges found a prior effort to require a permit unconstitutional because it unfairly focused on groups gathered for expressive conduct. *United States v. Israel*, No. CR–86–027–TUC–RMB (May 10, 1986); *United States v. Rainbow Family*, 695 F.Supp. 294 (E.D.Tex.1988).

It is this right to assemble that brings us to the current complaint before the

Court. Tracie Park charges that her right to assemble peaceably was infringed upon by the Forest Service when the Forest Service set up a checkpoint near the entrance to the Rainbow Family gathering. Park alleges that this roadblock was maintained to intentionally harass and intimidate people desiring to participate in the Rainbow Family gathering. She states that the entire nature of the gathering was altered because of the heavy law enforcement presence so near the entrance of the campsite. The Forest Service asserts that the purpose of the roadblock was a legitimate concern for public safety and protection of the environment, considering the size of the gathering on national forest lands.

## B. The 1996 Gathering in the Mark Twain Forest

In the summer of 1996, the Rainbow Family held their annual gathering in the Mark Twain National Forest. Plaintiff's Support at 3. James Scott ("Scott"), the District Law Enforcement Officer for the Forest Service, prepared an "action plan" on either June 21st or June 22nd of 1996 in order to deal with the Rainbow Family gathering. Plaintiff's Support Exhibit E, the Deposition of James Scott, at 5–6 [hereinafter "Scott Deposition"]. Participants began arriving in significant numbers around June 22nd or June 23rd. Plaintiff's Support Exhibit J. While no exact count of attendees was taken, Forest Service personnel estimated over 1000 people at the event on June 22nd. Id.

When attendance increased, the Forest Service instituted a "checkpoint" on a gravel road, approximately one mile from the main site of the Rainbow Family gathering. Id. The Forest Service placed the checkpoint on Forest Road 3173, at the intersection of Forest Roads 4150 and 4155. Scott Deposition at 10. This gravel road is over a mile and a half from the nearest paved road and ordinarily lightly traveled. Scott Deposition at 5–6, 15. Terry Miller, a District Ranger in the Mark Twain National Forest, described the traffic on the forest service road as "very light" except during hunting season in the fall. Plaintiff's Support Exhibit I, Deposition of Terry Miller at 4–5.

Law enforcement officers at this checkpoint stopped cars who were entering the gathering. Scott Deposition at 8. No cars were stopped as they exited the site unless officers had probable cause to stop the vehicle. Plaintiff's Support Exhibit D. The roadblock was maintained only for the duration of the gathering, approximately June 23d through July 7th or 8th. Plaintiff's Support at 3. Officers regularly manned the checkpoint throughout the daylight hours and into the wee hours of the morning. Id.

While Scott's "action plan" outlined the law enforcement activities for the 1996 gathering, it did not include any instructions for the actual operation of this checkpoint before the checkpoint began functioning. Scott Deposition at 6, 9. Around June 25th or 26th—after the checkpoint was already started—the Forest Service received a copy of the Missouri sobriety checkpoint policy. Scott Deposition at 9–10. The Forest Service checkpoint did not meet the state criteria because there were no signs set up to warn approaching motorists that a roadblock was ahead. Plaintiff's Reply to the Forest Service Motion to Dismiss for Lack of Subject Matter Jurisdiction or in the Alternative for Summary Judgment Exhibit 3 [hereinafter "Plaintiff's Reply"]. This deficiency, along with other problems, was described in a memo concerning the 1996 gathering from Warren J. DuBois, a District Ranger for the Mark Twain National Forest:

> The check point was requested to be closed because it was a mess. LE [law enforcement] was asked to have only two federal vehicles at the point and this was accepted but never implemented. At times there were so many LE vehicles that it became a traffic jam. A number of arrests were made as a result of the check point but an equal amount

of arrests were being made with the use of radar and enforcement of the speed limit. In their zeal to enforce the law the check point was operated illegally for a number of days. Missouri state law requires that a sign be placed before a check point informing the public that it is ahead. LE claimed that they were operating according to state law. Someone finally checked the law and a sign appeared but this was after the point had been operational for about one week.

Plaintiff's Reply Exhibit 2E.

Tracie Park went through the checkpoint twice, both times as a passenger. Plaintiff's Support at 5. The first encounter occurred on June 27, 1996, at approximately 5:00 a.m. Plaintiff's Support Exhibit B, Tracie Park Deposition, at 71–72 [hereinafter "Park Deposition"]. When the vehicle stopped, officers shone flashlights into the car. Park Deposition at 72. One officer, who recognized Park from an earlier encounter, spoke to Park as she waited at the checkpoint. *Id.* When Park asked the purpose of the roadblock, he stated that it was just a routine DWI check. Park Deposition at 80. Another officer asked the driver if he had been drinking. The officer also asked the driver for his license, proof of insurance, and registration. *Id.*

Park's second confrontation at the checkpoint came on July 2, 1996, when she exited the gathering site to buy supplies. Park Deposition at 81. Upon her return at approximately 10 p.m., the car in which she was riding was stopped at the checkpoint. *Id.* An officer asked Park to identify herself. Park Deposition at 106. The driver was asked for his license. Park Deposition at 83. According to Park, some cars were also checked by the officers at the checkpoint for safety checks, such as properly working headlights, turn signals, tail lights, and license plate lights. Park Deposition at 135. A law enforcement car clearly marked as a "canine unit" was also present at the checkpoint. Park Deposition at 82.

## III. PARK'S FOURTH AMENDMENT CLAIM

### A. *Standing*

All of the defendants allege in their respective motions for dismissal and/or summary judgment that Park is without standing to pursue her case before the Court. "It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Art. III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). Abstract injury will not suffice. The plaintiff must show that she is in immediate danger of sustaining or has sustained some direct injury as the result of the challenged official conduct. *Lyons,* 461 U.S. at 102–03, 103 S.Ct. at 1665. "[T]he injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Lyons,* 461 U.S. at 103, 103 S.Ct. at 1665 (citations omitted).

### 1. *The Forest Service*

The Forest Service contends that Park lacks standing to pursue an action on her Fourth Amendment complaint. The Forest Service endeavors to persuade the Court that Park's status as a passenger in the automobile affords her no right to seek relief under the Fourth Amendment. It maintains that the 1996 checkpoint "involved demands only on drivers" and because Park was not a driver, did not have a driver's license, and did not plan to get a car, her ability to challenge the action of the Forest Service in setting up the roadblock is somehow defective.

However, "stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth Amendment] . . . , even though the purpose of the stop is limited and the resulting

detention quite brief." *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). There is "no reason why a person's Fourth Amendment interests in challenging his own seizure should be diminished merely because he was a passenger, and not the driver, when the stop occurred." *United States v. Erwin,* 875 F.2d 268, 270 (10th Cir.1989). Therefore, Park has standing to complain of the Forest Service's action in maintaining a checkpoint within such close proximity of the Rainbow Family gathering.

■ The Forest Service also contends that no "case or controversy" exists in the case at bar because in 1998, the Forest Service adopted new regulations, which now provide detailed guidelines on the necessary requirements to set up a checkpoint. As Park points out, this is essentially an argument that her claims have been mooted by the new regulations. However, Park does not object to the Forest Service's implementation of the checkpoint on some alleged flaw in procedure. Instead, Park challenges the right of the Forest Service to ever establish a roadblock so close to the gathering without obtaining a prior warrant. Thus, any procedural deficiencies which may have existed before the new regulations went into effect would not affect the outcome in this case.

Park has a legitimate concern that the Forest Service, with or without the new regulations, will continue to operate checkpoints at Rainbow Family gatherings. Thus, this same controversy is capable of repetition. Because the gathering, and therefore the checkpoint, is of short duration, Park or any other objecting Rainbow Family member could not wait until such a checkpoint is authorized and then bring a lawsuit to challenge it. Park may, therefore, proceed on her demands that the Forest Service cease establishing a roadblock so closely to the gathering, which

allegedly unfairly targets Rainbow Family members.

### 2. The Missouri State Highway Patrol

■ In addition to the Forest Service, Park named the Superintendent of the Missouri State Highway Patrol (MSHP) Fred Mills (as of September 1, 1997, Weldon Wilhoit) as one of the defendants in her complaint. MSHP argues that it is not a proper defendant because it did not plan or implement the checkpoint at issue. MSHP states that the Forest Service alone made the decision to establish the checkpoint and the only role that the MSHP played was one of assistance.

MSHP officers were present at the checkpoint to assist the Forest Service. Suggestions of Defendant Wilhoit in Opposition to Plaintiff's Motion for Summary Judgment and in Support of the Motion of Defendant Wilhoit for Summary Judgment at 2 [hereinafter "MSHP Opposition"]. MSHP and the Forest Service had a "mutual agreement of cooperation" to enforce civil and criminal laws in connection with the Rainbow gathering. MSHP Opposition Exhibit A, Affidavit of Billy Chadwick. "MSHP personnel were assigned to patrol the highways surrounding the gathering area." *Id.* If the Forest Service discovered a suspected intoxicated driver, the Forest Service would notify MSHP personnel to assist in the arrest and transportation of the suspect. *Id.* The only contact that MSHP had with any decisions regarding the implementation of the checkpoint was to furnish the Forest Service a copy of the MSHP's policy concerning the establishment of sobriety checkpoints. MSHP Opposition at 2. The Forest Service did not even receive these policy guidelines until after the checkpoint had been established. Scott Deposition at 9–10.

The Rainbow Family gathers on national forest land. The Forest Service made the

decision to establish the checkpoint and decided to place it on a back road, near the gathering site. MSHP personnel played no role except to assist the Forest Service in the peripheral operation of the roadblock. MSHP has no authority to plan and implement checkpoints on national forest lands. Therefore, Park has sustained no "direct injury" as a result of an MSHP checkpoint. The Court will dismiss Park's Fourth Amendment claims against the MSHP.

### 3. Oregon County

Defendant Oregon County lodges the same argument as the MSHP regarding standing. Oregon County law enforcement personnel merely staffed the Forest Service checkpoint. The Forest Service created the checkpoint. For the same reasons stated above, Park has no standing to pursue a Fourth Amendment claim against Oregon County.

### B. Burden of Proof

██ Both Park and the Forest Service make extensive arguments concerning the applicable burden of proof. Park alleges that where the implementation of a governmental policy clashes with First Amendment rights, the government bears the burden of proof. Park contends that the burden must be particularly heavy in a case where the government singles out a particular group exercising their associational rights in a public forum. As support for this proposition, Park cites *Stanford v. Texas*, 379 U.S. 476, 485, 85 S.Ct. 506, 511–12, 13 L.Ed.2d 431 (1965) and *United States v. Apker*, 705 F.2d 293, 301 (8th Cir.), *modified on other grounds sub nom, United States v. Fitzgerald*, 724 F.2d 633 (8th Cir.1983) (en banc). However, those cases pertained to the seizure of books which were confiscated for the ideas they contained (*Stanford*) or of documents, photographs, telephone books, and clothing

items which were taken because of the associations they demonstrated (*Apker*). Park seeks to persuade the Court to extend the reasoning in those cases to *her* seizure at the Forest Service roadblock.

The Court declines the opportunity to travel down that road. The focus of all the cases presented as support that this Court should apply a heightened standard to the case at bar is the particularity of warrants requirement contained in the Fourth Amendment: "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The *Stanford* Court explained: "In short, what ... history indispensably teaches is that the constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the most scrupulous exactitude *when the 'things' are books,* and the basis for their seizure is the ideas which they contain." *Stanford,* 379 U.S. at 485, 85 S.Ct. at 511–12 (emphasis added). In *Apker,* the Eighth Circuit concluded that "it is necessary that *warrants for searches* for evidence of membership in bona fide organizations meet the fourth Amendment requirements with scrupulous exactitude." *Apker,* 705 F.2d at 301 (finding that searching for indicia of membership in the Hell's Angels violated the Fourth Amendment) (emphasis added). The seizure of Park does not fall within the confines of the protection offered by the application of the scrupulous exactitude standard.

### C. The Constitutionality of Roadblocks

When motorists are stopped at a checkpoint, they are "seized" for purposes of the Fourth Amendment. *United States v. Martinez–Fuerte,* 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976). "The question thus becomes whether such seizures are 'reasonable' under the Fourth Amendment." *Michigan Department of*

*State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). "The reasonableness of checkpoint stops .. turns on factors such as the location and method of operation of the checkpoint .... " *Martinez–Fuerte,* 428 U.S. at 565–66, 96 S.Ct. at 3086.

■ Courts reviewing the reasonableness of checkpoints typically consider factors such as: (1) the neutral criterion implicit in a systematic procedure (*Hall v. Commonwealth,* 12 Va.App. 972, 406 S.E.2d 674 (1991) (roadblock was constitutionally flawed where individual officers had broad discretion)); (2) warning signs or flares (*State v. Riley,* 377 N.W.2d 242 (Iowa Ct.App.1985) (roadblock constitutional where adequate advance warning signs, illuminated at night timely informed approaching motorists)); (3) the safety of the location (*Commonwealth v. McGeoghegan,* 389 Mass.137, 449 N.E.2d 349 (1983) (roadblock poorly illuminated and unsafe for motorists)); (4) the productivity of the roadblock (*State v. Koppel,* 127 N.H.286, 499 A.2d 977 (1985) (roadblock exceeded constitutional limitations where only 18 drivers arrested out of 1680 vehicles stopped)); (5) standardized procedures for the operation of the roadblock (*State v. Larson,* 485 N.W.2d 571 (Minn.Ct.App. 1992) (finding license checkpoint unconstitutional when implemented with no specific written instructions to control discretion of field officers)); and (6) whether the roadblock was a pretext to uncover evidence of more serious criminal activity (*United States v. Morales–Zamora,* 974 F.2d 149 (10th Cir.1992) (finding police roadblock unconstitutional where drug-sniffing dog was used to examine cars while officers checked drivers' licenses)).

■ In a case examining the constitutionality of sobriety checkpoints, the Supreme Court articulated a balancing test for determining whether a road checkpoint falls within the bounds of the Fourth Amendment. *Sitz,* 496 U.S. at 448–49, 110 S.Ct. at 2484. A reviewing court must balance: (1) the importance of the public concerns served by the checkpoint; (2) the effectiveness of the checkpoint in advancing the public interest; and (3) the extent of the intrusion of the checkpoint on law-abiding motorists. *Sitz,* 496 U.S. at 449, 110 S.Ct. at 2484. The *Sitz* Court found that the sobriety checkpoint at issue did not violate the provisions of the Fourth Amendment. However, before the Court applies the factors set forth in *Sitz* to the checkpoint at issue in the case at bar, it is necessary to determine exactly what public interest the Forest Service was allegedly attempting to serve.

### D. *The Nature of the 1996 Checkpoint*

The exact purpose of the checkpoint is elusive. Several days after it became operational, the 1996 checkpoint used a Missouri Highway Patrol policy on sobriety checkpoints as a guide. However, the Forest Service maintains that the checkpoint was not instituted for the purpose of checking for drunk drivers, but rather as a "safety" checkpoint. Scott Deposition at 29, 37. But still again, an officer at the scene told Tracie Park that it was indeed a routine DWI checkpoint. Park Deposition at 80. Mike Ashby, who is with the Forest Service Law Enforcement, told an attendee that the purpose of the roadblock was to stop speeders and drinkers. Plaintiff's Reply Exhibit 4A. Pancho Smith, a supervisory law enforcement officer for the Forest Service, stated that the checkpoint was operated to check for safety violations. Plaintiff's Support Exhibit G, Pancho Smith Deposition, at 12 [hereinafter "Smith Deposition"]. Yet Smith also stated that when officers stopped vehicles, they asked to see a driver's license, proof of insurance, and registration. Smith Deposition at 5. Smith made no mention of checking brakes or lights. In answer to an interrogatory for this lawsuit, which

asked the Forest Service to identify all of the governmental purposes that were served by operation of the checkpoint, the Forest Service stated: "Road Checkpoints are effective for deterring criminal conduct and enhancing traffic safety." Plaintiff's Support Exhibit D. Sheriff Tim Ward, of the Oregon County Sheriff's Department, told an attendee that the roadblock was used "as an opportunity to catch local drug dealers." Plaintiff's Reply Exhibit 4A. The Forest Service also maintains that the checkpoint was used as an informational tool: an opportunity to tell the entering Rainbow Family members about the restrictions on fireworks and nudity, where to park their vehicles, as well as to answer any questions attendees might have. However, Park states that no such information was shared with her or any of her acquaintances. One participant, who went through the roadblock on several occasions, was never given any information on "speed limits, nudity tolerance limits, or parking lot location." Plaintiff's Reply Exhibit 4A.

### 1. If the Checkpoint was a Sobriety Checkpoint

■ As stated above, the Supreme Court has stated that sobriety checkpoints do not violate the Fourth Amendment. *Sitz,* 496 U.S. at 455, 110 S.Ct. at 2488. However, the checkpoint in the case before this Court differs in significant aspects. The Forest Service elected to place the checkpoint on a seldom-traveled gravel road within the national forest over a mile away from a highway and only a mile from the main campsite of the Rainbow Family. When the Supreme Court judged the constitutionality of the sobriety checkpoint in *Sitz,* the Court was looking at a checkpoint set up on a publicly-traveled road.

Furthermore, in *Sitz,* 126 drivers were stopped in a 75–minute period and detained an average of 25 seconds. *Sitz,* 496 U.S. at 448, 110 S.Ct. at 2484. Law en-forcement officers "briefly examined [drivers] for signs of intoxication." *Sitz,* 496 U.S. at 447, 110 S.Ct. at 2484. The officers in *Sitz* did not use the stop as an opportunity to see what driver's license and registration violations they could find. Nor did they do safety tests of vehicles that were stopped or shine flashlights into cars' interiors in an effort to find contraband.

Of the 126 vehicles that passed through the checkpoint in *Sitz,* "[t]wo drivers were detained for field sobriety testing, and one of the two was arrested for driving under the influence of alcohol." *Sitz,* 496 U.S. at 448, 110 S.Ct. at 2484. One other driver who drove through the checkpoint without stopping was arrested for driving under the influence. *Id.* When assessing the second factor of the balancing test, the effectiveness of the checkpoint in advancing the public interest, the *Sitz* Court found that the 1.6% arrest rate was satisfactory to sustain the use of the sobriety checkpoint, considering the gravity of concern "of alcohol-related death and mutilation on the Nation's roads." *Sitz,* 496 U.S. at 451, 455, 110 S.Ct. at 2485, 2487–88.

As already discussed above, the Court is uncertain if the checkpoint at issue in the case at bar can be discussed in the same light as the checkpoint in *Sitz:* the cars were being stopped on a gravel road with a posted speed limit of 20 m.p.h. and were within a mile of their eventual destination. While alcohol-related accidents are not impossible on such a road, they are highly unlikely. But leaving that concern aside for a moment, the Court cannot see that the checkpoint in question came up to even the minimal standard of effectiveness elucidated in *Sitz.*

While officers did not keep a count of cars entering the Rainbow Family site, the Forest Service estimated more than 5,000 cars at the gathering during the peak attendance. Motion of the United States

Forest Service to Dismiss for Lack of Subject Matter Jurisdiction or in the Alternative for Summary Judgment at 16 [hereinafter "Forest Service's Motion"]. Sixteen drivers were arrested for driving while intoxicated. Forest Service's Motion at 15. If every car entered the site only once and officers stopped every car, the arrest rate was three tenths of one percent. *See United States v. Huguenin*, 154 F.3d 547 (6th Cir.1998) (holding that .29 percent level was insufficient under the *Sitz* effectiveness test). While not every car was stopped, neither did all 5000 cars enter the gathering and remain there for the duration. The plaintiff herself was stopped twice because she left the campsite to get supplies. Another attendee, Carla Newbre, stated she was stopped on "several occasions." Plaintiff's Reply Exhibit 4A. It seems reasonable to the Court to assume that others came and went as well. So, while the Court may only speculate about the actual statistical success rate, it seems likely that it was less than that approved by the *Sitz* Court.

The Forest Service argues that the effectiveness of the checkpoint should be calculated by using the arrest statistics for all citations arising from the operation of the checkpoint. But a "sobriety checkpoint" assesses the effectiveness of that checkpoint on the number of possible drunk drivers removed from public highways, not how many drivers failed to have vehicle registrations or valid driver's licenses.

The Forest Service also asks the Court to validate the checkpoint effectiveness because other courts have done so. But other courts were looking at checkpoints with one purpose or aim, not the multiheaded checkpoint at issue here. Further, those checkpoints were set up on publicly traveled streets and roads, not the lonely forest road in the case at bar.

### 2. If the Checkpoint was for General Deterrence

■ In an answer to an interrogatory, the Forest Service stated that one of the purposes served by its operation was to deter criminal conduct. Plaintiff's Support Exhibit D. While the Supreme Court has validated roadblocks and checkpoints in limited circumstances in order to detect criminal conduct, it most certainly has not suggested that police may use a roadblock for general law enforcement.

The Supreme Court has found roadblocks unobjectionable in two specific instances: to detect illegal aliens and drunk drivers. In both cases, the Court noted the government's significant interest in combating the problem at hand. First, in *Martinez–Fuerte*, the Court upheld the constitutionality of permanent immigration checkpoints located near the nation's borders to deal with the "formidable" problem posed by "the flow of illegal [immigrants] from Mexico." *United States v. Martinez–Fuerte*, 428 U.S. 543, 552, 96 S.Ct. 3074, 3080, 49 L.Ed.2d 1116 (1976). Similarly, the *Sitz* Court noted the importance of the government's unique interest in combating drunk driving when it upheld the constitutionality of sobriety checkpoints. *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 451, 110 S.Ct. 2481, 2486, 110 L.Ed.2d 412 (1990).

In considering the issue of whether a roadblock may be established to deter crime, a federal district court in Texas found a police roadblock unconstitutional when it was set up near the entrance of a subdivision in order to reduce gang-related criminal activity. *Shankle v. Texas City*, 885 F.Supp. 996 (S.D.Tex.1995) (holding that an "area warrant" was necessary prior to erecting roadblocks at key points of entry into the subdivision). Similarly, a District of Columbia Court of Appeals invalidated a roadblock established in a high crime area, finding that "the government's general deterrence interest is not substantial enough to outweigh the seized individuals' liberty interests." *Galberth v. United States*, 590 A.2d 990, 998 (D.C.Ct.App. 1991).

This Court agrees with both the *Shankle* and *Galberth* courts: the intrusion upon the law-abiding citizens attempting to enter the Rainbow Family gathering is too great to justify a roadblock erected to have some kind of "deterring effect" upon attendees. While law enforcement is an important goal, it cannot sustain the erosion of personal liberty. Fourth Amendment freedoms

> are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government.

*Brinegar v. United States*, 338 U.S. 160, 180, 69 S.Ct. 1302, 1313, 93 L.Ed. 1879 (1949) (Jackson, J., dissenting).

Justice Jackson went on to propose that exceptions to the Fourth Amendment should perhaps be based on the gravity of the offense:

> If we assume, for example, that a child is kidnaped and the officers throw a roadblock about the neighborhood and search every outgoing car, it would be a drastic and undiscriminating use of the search. The officers might be unable to show probable cause for searching any particular car. However, I should candidly strive hard to sustain such an action, executed fairly and in good faith, because it might be reasonable to subject travelers to that indignity if it was the only way to save a threatened life and detect a vicious crime. But I should not strain to sustain such a roadblock and universal search to salvage a few bottles of bourbon and catch a bootlegger.

*Brinegar*, 338 U.S. at 183, 69 S.Ct. at 1314.

The checkpoint in this case is more closely aligned with salvaging "a few bottles of bourbon." Most of the citations written by the law enforcement authorities were for relatively minor infractions, such as driving without a license. Targeting a group—any group—and setting up a checkpoint in close proximity to the site of their gathering, in order to ferret out a few lawbreakers cannot be done at the expense of trammeling the rights of law-abiding citizens. Out of the approximated 15,000 attendees at the Rainbow Family gathering, a total of 42 "drug-related" offenses were pursued by the Oregon County prosecutor. Forest Service's Motion Exhibit G. Of these, *four* were felony offenses. *Id.* Basically subjecting Rainbow Family members to a "shakedown" to achieve such ignominious results should strike fear into any citizen who values their personal liberty.

### 3. If the Checkpoint was to Check for Driver's Licenses, etc.

■ In *Delaware v. Prouse*, the Supreme Court intimated that while stopping individual motorists to "spot check" for valid driver's licenses and registrations violated the Fourth Amendment, police were not precluded from developing methods that involved less intrusion, such as questioning all oncoming traffic at roadblock-type stops. *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979). Checkpoints to detect vehicle equipment violations and to prevent uninsured or unlicensed motorist from operating their vehicles on public roads have been upheld by many courts: *United States v. Trevino*, 60 F.3d 333 (7th Cir. 1995) (finding a checkpoint located on a public street in Peoria, Illinois, which stopped every car constitutional), *cert. denied*, 516 U.S. 1061, 116 S.Ct. 739, 133 L.Ed.2d 689 (1996); *Merrett v. Moore*, 58 F.3d 1547 (11th Cir.1995) (roadblock on state highway did not unreasonably interfere with motorists so long as detention was brief and awaiting motorists felt free

to leave the line), *cert. denied,* 519 U.S. 812, 117 S.Ct. 58, 136 L.Ed.2d 21 (1996); *United States v. McFayden,* 865 F.2d 1306 (D.C.Cir.1989) (roadblock to regulate vehicle traffic in highly congested traffic area was constitutional when police were required to check all cars, with no discretion to engage in random or roving stops); *United States v. Corral,* 823 F.2d 1389 (10th Cir.1987) (holding that a roadblock on a state highway was constitutional when it did not involve a selective stop chosen at the officers' discretion), *cert. denied sub nom., Martinez–Fabela v. United States,* 486 U.S. 1054, 108 S.Ct. 2820, 100 L.Ed.2d 921 (1988).

Two distinguishing features become apparent when the above cases are studied. First, the various roadblocks and checkpoints were established on public streets and highways, not gravel forest roads. Second, the analysis of the checkpoint's legality almost always rested upon the nondiscretionary nature of the roadblock. The *Trevino* court recited the reasoning in *Sitz,* the Supreme Court's decision that upheld the constitutionality of sobriety checkpoints: "what was dispositive in *Sitz* was that pursuant to neutral guidelines uniformed officers conducting the checkpoint stopped every incoming vehicle, and were not at liberty to randomly decide which motorists would be stopped and which would not." *Trevino,* 60 F.3d at 337. The *McFayden* court also recognized the importance of neutrality when it emphasized that a roadblock must be conducted in a systematic and nondiscriminatory fashion. *McFayden,* 865 F.2d at 1310. The Forest Service's checkpoint lacked the features that supported the constitutionality of the above cited cases.

Courts upholding the right of law enforcement officers to set up such roadblocks have reasoned that checkpoints and roadblocks are preferable to allowing unfettered discretion to police to "randomly" stop whomever they choose. Courts have feared that the alleged "random" stops are not random at all and could unfairly target certain citizens in violation of the Fourth Amendment. Yet the checkpoint at issue in the case at bar turns that benefit of checkpoints on its head because as the Forest Service freely admits, the location was chosen to specifically target the Rainbow Family. By its placement of the checkpoint, it ensures that it is *not* random. In other words, the entire reason that checkpoints are preferable to individual random stops by law enforcement personnel is the inherent neutrality. Yet, the Forest Service's actions have transformed the strength of roadblocks and checkpoints into a fault.

### E.  *The Court's Findings*

After a careful review of the record, the Court finds that the 1996 checkpoint was set up for the purpose of generally deterring criminal activity. First of all, after the initiation of the instant lawsuit, the Forest Service itself stated that general criminal deterrence was one of the two purposes served by the checkpoint. No evidence exists to support that the other stated purpose—that of enhancing traffic safety—could not be achieved by less intrusive means. A district ranger stated that "an equal amount of arrests were being made with the use of radar and enforcement of the speed limit." Plaintiff's Reply Exhibit 2E. Similarly, drivers operating their vehicles while under the influence of alcohol could have also been detected by simple observation rather than subjecting all attendees at the gathering to a checkpoint stop. As discussed earlier, a checkpoint established for the purpose of general deterrence violates the protections given to every citizen by the Fourth Amendment.

Even if the checkpoint was operated as a driver's license check, a purpose validated by a number of courts, the one at issue here pushes the limits of acceptability too

far. Again, the foundation of neutrality is essential to the constitutionality of such checkpoints. The Forest Service specifically targeted the Rainbow Family gathering, had no written operational guide in place prior to the establishment of the checkpoint, and admittedly, maintained the checkpoint in violation of Missouri law until receipt of the MSHP sobriety checkpoint policy guide.

Furthermore, in response to a proposed rule change, the Forest Service itself has stated that such a purpose is not appropriate:

> The Department acknowledges that the level of law enforcement activities may not always have been appropriate for group uses.... [W]hile it may be appropriate to post Forest Service officials at the entrance to a Rainbow Family Gathering to deter illegal activity and to provide helpful information on the national forests and resource protection, *it is not necessary or appropriate to search cars entering the Gathering or to verify the driver's car registration, insurance, and license.*

60 Fed.Reg. 45258, 45265–66 (Aug. 30, 1995) (emphasis added). The Court notes that these comments from the Forest Service came well before the initiation of the 1996 checkpoint.

And even if the Court believed that the checkpoint was established to check driver's licenses and the like, it was used as a subterfuge to allow law enforcement officers to question attendees, do plain view searches, and basically attempt to muster up whatever charges they could find to press against Rainbow Family members. The Sixth Circuit succinctly stated the concerns about pretextual roadblocks:

> [A] pretextual roadblock has pitfalls that come perilously close to permitting unfettered government intrusion on the privacy interests of all motorists.... We believe that the danger inherent in pretextual roadblocks is the potential for giving police the authority to stop every car on the road, question its driver and passengers under the guise of a legitimate traffic-related purpose, and then claim enough reasonable suspicion through, for example, the driver's expression or answers, to conduct a more thorough search of the stopped individuals and vehicles for drugs with insufficient limitations on police discretion.

*United States v. Huguenin,* 154 F.3d 547, 554–55 (6th Cir.1998). Furthermore, evaluation of a pretextual roadblock is flawed because the ostensible guidelines for its operation do not reflect its actual operation. *Id.* at 556.

There is clear evidence in the record that a schism developed within the Forest Service between the divisions of resource protection and law enforcement on how to approach the problems induced by the Rainbow Family gathering. Evidence in the record supports the conclusion that *non*-law enforcement personnel attempted to work with the Rainbow Family in order to minimize the impact on the environment that any large group gathering produces. One participant, who has attended Rainbow gatherings since 1979, stated that the "resource people" are helpful. Plaintiff's Reply Exhibit 4A. "The law enforcement side of the Forest Service, however, is another matter. The roadblocks they operate are disruptive, dangerous and much resented by gathering participants." *Id.*

Frictions between the two divisions centered around the contested checkpoint. Resource management personnel had negotiated with the Rainbows concerning the removal of the roadblock. After the Incident Command Team requested that the checkpoint be removed, Billy Ball, the Forest Service law enforcement agent in charge, contacted the Washington office. Plaintiff's Reply Exhibit 2E. The Washington office reportedly responded, "We don't

tell foresters how to mark trees and they should not be telling us how to conduct our business." *Id.* Because of the decision to place the activities of the law enforcement division outside the authority of the Incident Management Team, Lyn Carpenter, drafted a memo that stated this action compromised his ability to fulfill his obligations to protect life and property and ensure public safety. Plaintiff's Reply Exhibit 2D.

It is not as though the checkpoint achieved fantastic results and apprehended a great number of dangerous drug dealers. A memo from District Ranger Warren DuBois reports on greater successes attained at both a Vermont and a Colorado gathering without the use of checkpoints:

> No armed patrols inside the gatherings or check points were used. The rainbows understood that LE [law enforcement] would go inside if they had to and they did on a number of occasions without incident and the harassment that the LE folks endured on the Mark Twain. Significant and larger drug busts were made in Vermont when the dealers came out of the gathering then [sic] that which happened to date on the Mark Twain. The Colorado gathering identified major dealers that were busted when they returned to their home operations in California.

*Id.*

In light of all of the above and applying the *Sitz* balancing test, the Court finds that the government's interest in general deterrence is not substantial enough to outweigh the liberty interests of Park and other Rainbow Family attendees. While the Court finds that the Forest Service has a legitimate concern on how to handle such a great influx of people on national forest lands, the Fourth Amendment prevents the Forest Service from flexing its law enforcement muscle as a way to accomplish that goal. The Forest Service may

not use the Rainbow Family gathering as an excuse to canvas the myriad of participants—most of whom are law abiding—in hopes of ferreting out a few lawbreakers.

## IV. PARK'S FIRST AMENDMENT CLAIM

Count II of Park's complaint concerns her allegations that defendants sought to restrict her right to free expression and assembly, as guaranteed by the First Amendment. For the same reasons as stated under the analysis of Park's Fourth Amendment claim, the Court will dismiss the action against Weldon Wilhoit, the Superintendent of the Missouri State Highway Patrol and Oregon County. Because the Court has granted summary judgment to Park on her Fourth Amendment claim against the Forest Service, the Court will not address the issues involved in Park's action under the First Amendment against the Forest Service.

Accordingly, it is

ORDERED that Plaintiff's Motion for Summary Judgment is granted; and it is further

ORDERED that the Motion of the United States Forest Service to Dismiss for Lack of Subject Matter Jurisdiction or in the Alternative for Summary Judgment is denied; and it is further

ORDERED that Defendant Oregon County's Motion for Summary Judgment and in Alternative to Dismiss for Lack of Subject Matter Jurisdiction and for Failure to State a Claim is granted; and it is further

ORDERED that Defendant Wilhoit's Motion for Summary Judgment is denied in part and granted in part; and it is further

ORDERED that the plaintiff's claims against defendants Oregon County and Weldon Wilhoit, acting in his official capac-

ity as the Superintendent of the Missouri State Highway Patrol are dismissed because plaintiff has no standing to pursue claims against these defendants; and it is further

ORDERED that the Forest Service of the United States of America is enjoined from establishing any roadblocks or checkpoints that violate the contents of this Order.

## *ORDER*

Two motions are outstanding in this case. Both relate to an injunction the Court ordered on June 11, 1999. On June 25, 1999, defendant Forest Service of the United States of America ("Forest Service") filed a motion to alter or amend judgment. On June 28, 1999, defendant Weldon Wilhoit filed a motion for clarification. Both motions are ripe for review and the Court will address each in turn.

The Forest Service seeks to "clarify the scope of the injunction." In its suggestions in support, the Forest Service argues that the Court must not have intended a "broad injunction" because of the Court's lengthy discussion concerning the deficiencies of the 1996 checkpoint that the Forest Service had established near the entrance of a Rainbow Family gathering. The Forest Service states that such a discussion would have been "unnecessary and irrelevant" had the Court intended its injunction to be applied with "breadth."

On the contrary, the Court did intend "breadth." The Court will clarify the "discussion of deficiencies" at issue: because of the seeming inability of the Forest Service and its attorneys to offer a consistent explanation of the purpose of the 1996 checkpoint at the Rainbow Family gathering, it was necessary for the Court to go to great lengths to analyze each of the proffered purposes. As the Court stated in its previous Order, *no matter what the pur-*

*pose of the 1996 checkpoint, it was unconstitutional.* That 1996 checkpoint was set up in such a location as to specifically target Rainbow Family members. That robs a checkpoint of the very premise under which courts have found them legitimate: neutrality.

On the other hand, this Court does not intend to give free rein to any group of people to gather and disobey laws. The Forest Service is free—as it always has been—to enforce this nation's laws on an individualized basis. However, any future checkpoint or roadblock set up in connection with Rainbow Family gatherings must be applied to all citizens equally. That means that the Forest Service may not choose some remote location for its checkpoint, traveled mostly only by those attending the gathering. Logically then, the location of a checkpoint must be on a public highway used by all types of citizens. Nor may the Forest Service ever use a checkpoint, no matter its location, as an opportunity to "generally deter criminal activity."

As to the motion by defendant Weldon Wilhoit, sued in his official capacity as the Superintendent of the Missouri State Highway Patrol ("MSHP"), that motion seeks confirmation that the claims against the MSHP are dismissed in total. Apparently, the MSHP is confused as to why its motion for summary judgment was "denied in part and granted in part." In its motion for summary judgment, the MSHP addressed not only the issue of standing, but also went on to discuss the merits of the claims. Hence, the Court granted the judgment as to the issue of standing and denied all other arguments presented in MSHP's brief. This seems clear to the Court but in order to make it clear to the MSHP, it is

ORDERED that the Order of June 11, 1999, dismissed all of plaintiff Tracie Park's claims against defendant Weldon

Wilhoit, the Superintendent of the Missouri State Highway Patrol; and it is further

ORDERED that the Forest Service's Motion to Alter or Amend Judgment is denied.